U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
SEP 17 2018
CLERK, U.S. DISTRICT COURT
By _____
Deputy

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* Stephanie M. Kruse; | § § § | **CIVIL NO.: 3:CV18-938-K **SEALED**** |
| STATE OF OKLAHOMA *ex rel.* Stephanie M. Kruse; | § § § | |
| STATE OF TEXAS *ex rel.* Stephanie M. Kruse; | § § § § | **RELATOR STEPHANIE M KRUSE'S FIRST AMENDED COMPLAINT FILED PURSUANT TO 31 U.S.C. §§ 3729 – 3732** |
| STATE OF NEW MEXICO *ex rel.* Stephanie M. Kruse; | § § § | **FEDERAL FALSE CLAIMS ACT AND STATES' FALSE CLAIMS ACT AND PENDENT CLAIMS** |
| Doe States 1 – 45 and District of Columbia *ex rel.* Stephanie M. Kruse, | § § § § | **FILED UNDER SEAL** |
| Plaintiffs, | § § § | |
| v. | § § § | **JURY TRIAL DEMANDED** |
| COMPUTER PROGRAMS AND SYSTEMS, INC.; TRUBRIDGE LLC.; MUSKOGEE REGIONAL MEDICAL CENTER; CRESCENT MEDICAL CENTER LANCASTER; and ARTESIA GENERAL HOSPITAL | § § § § § § § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT

1

## Table of Contents

FIRST AMENDED COMPLAINT (UNDER SEAL) & JURY TRIAL DEMAND ...................... 4

I.  SUMMARY OF ACTION ................................................................................................ 5

II.  PARTIES........................................................................................................................... 9

   A.  Relator Stephanie M. Kruse ..................................................................................... 9

   B.  Government Plaintiffs ............................................................................................. 10

   C.  Computer Programs and Systems, Inc. ("CPSI")................................................... 10

   D.  TruBridge LLC ("TruBridge") .............................................................................. 10

   E.  Saint Francis Hospital Muskogee formerly Muskogee Regional Medical Center
       ("Muskogee Regional")........................................................................................... 11

   F.  Crescent Medical Center of Lancaster ("Crescent Medical")................................ 12

   G.  Artesia General Hospital ("Artesia General")....................................................... 13

III.  JURISDICTION AND VENUE..................................................................................... 14

IV.  FEDERAL HEALTHCARE PROGRAMS ................................................................... 16

   The Medicare and Medicaid Programs............................................................................ 16

   TRICARE ........................................................................................................................ 19

V.  REGULATORY FRAMEWORK.................................................................................. 20

   A.  The False Claims Act .............................................................................................. 20

   B.  Medicare Program ................................................................................................... 20

      1.  Medicare Inpatient Prospective Payment System ........................................... 22

      2.  Medicare Physician Payment System .............................................................. 24

         a.  Credentialing of Physicians – License Requirement and Excluded Physicians ..... 24

         b.  Payment of Substitute Physicians (Locum Tenens) – 60-day Rule ........................ 26

      3.  Outpatient Prospective Payment System ......................................................... 29

         a.  Same-Day Rule ...................................................................................................... 30

         b.  Bundling Requirements and Use of Modifier -59 ................................................. 31

         c.  Use of Modifier XU .............................................................................................. 32

VI.  RELATIONSHIPS OF THE PARTIES......................................................................... 32

VII.  FACTUAL ALLEGATIONS........................................................................................ 38

   A.  CPSI and Muskogee Regional fraudulently submitted false physician information of
       numerous claims and received payment on falsified claims from Medicare, Medicaid
       and other Federal Healthcare programs in Muskogee, Oklahoma................................. 39

   B.  TruBridge and Crescent Medical fraudulently billing Medicare, Medicaid and other
       Federal Healthcare Programs by:................................................................................... 42

1)  use of permanent staff (regular) physicians NPI and identity to bill services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs; and.................................................. 42

2)  fraudulent billing of medical services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs by using the identity and NPI of credentialed staff physicians (regular) and who were not involved in the medical services. ......................................................... 42

C.  TruBridge and Artesia General fraudulently submitted false physician claims and received payment on falsified claims from Medicare, Medicaid and other Federal Healthcare programs in New Mexico through a variety of fraudulent billing schemes. 46

VII.  CLAIMS FOR RELIEF..................................................................................... 56

    COUNT I ............................................................................................................ 56

        False Claims Act – Presentation of False Claims ............................................... 56

        31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009.......................... 56

    COUNT II............................................................................................................ 57

        False Claims Act – Making or Using False Record or Statement to Cause Claim to Be Paid............................................................................................................... 57

        31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009 .......................... 57

    COUNT III........................................................................................................... 57

        False Claims Act – Making or Using False Record or Statement to Conceal, Avoid, and/or Decrease Obligation to Repay Money ................................................................. 57

        31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009 ......................... 57

    COUNT IV ......................................................................................................... 58

        False Claims Act - Conspiracy .......................................................................... 58

        31 U.S.C. § 3729(a)(3), 31 U.S.C. § 3729(a)(1)(C) as amended in 2009.......................... 58

    COUNT V............................................................................................................ 59

        OKLAHOMA MEDICAID FALSE CLAIMS ACT ........................................................ 59

    COUNT VI .......................................................................................................... 62

        TEXAS FALSE CLAIMS ACT ............................................................................. 62

    COUNT VII ......................................................................................................... 65

        NEW MEXICO MEDICAID FALSE CLAIMS ACT ...................................................... 65

    COUNT VIII......................................................................................................... 69

        Unlawful Retaliation Under the False Claims Act 31 U.S.C. § 3730(h)........................... 69

        PRAYER FOR RELIEF ...................................................................................... 69

    IX.  JURY TRIAL DEMAND .................................................................................. 71

## AMENDED COMPLAINT (UNDER SEAL) and JURY TRIAL DEMAND

C O M E S   N O W ,  Ms. Stephanie M. Kruse, for and on behalf of the United States of America, the States of Oklahoma, Texas, and New Mexico, Doe States and District of Columbia and complains against Defendants Computer Programs and Systems, Inc.; TruBridge, LLC; Saint Francis Hospital Muskogee formerly Muskogee Regional Medical Center; Crescent Medical Center Lancaster and Artesia General Hospital, (all five (5) entities  collectively referred to as "the Defendants") and does file this Amended Complaint. As with the initial Complaint, this *qui tam* action under the False Claims Act ("FCA") is being filed *ex parte* and under  seal as required by the FCA,  31 U.S.C. § 3730(b)(2).

In support of this Amended Complaint, Relator, Stephanie M. Kruse on behalf of the United States of America, the States of Oklahoma, Texas, and New Mexico ("Qui Tam States"), Doe States and District of Columbia ("Doe States") adopt and incorporate all Exhibits previously filed with and in support of the initial Complaint. This Amended Complaint does add and amend the initial Complaint as follows:

A)      amending the timeframe Relator was assigned to Defendant Muskogee Regional Medical Center from February, 2012 to June, 2013 to the timeframe of February, 2012 to June, 2012 when she was employed with CPSI; not TruBridge, LLC (not yet in existence), and correcting associated allegations in ¶¶ 8, 25, 29, 127, and 135 of the initial Complaint and also deleting TruBridge, LLC from ¶¶ 25 and 29 and deleting Muskogee Regional from ¶¶23 and 24;

B)      amending  the timeframe Relator was assigned to Defendant Crescent Medical Center of Lancaster from February, 2015 through January, 2016 to the timeframe of July, 2013 through January, 2015 and correcting associated allegations in ¶¶ 8, 30, 34, 105, 140, 143, 147, 150, 154, and 155 of the initial Complaint;

C)     amending the language in ¶137 so that the last clause of the paragraph reads ". . . and therefore, could **not** derive any income for work she did not do **and had not done** for two (2) years **as Dr. Hast had** no affiliation with Muskogee Regional **for that period of time",** adding the bold-faced language;

D)     substituting the words "Crescent Medical's" for "Artesia's" in ¶¶ 143 and 144 of the initial Complaint;

E)     substituting the words "made from" for "pursuant to" in the last portion of the last sentence in ¶ 145; and

F)     substituting the word "Physician" for "Professional" in ¶ 161 of the initial Complaint so that the certification correctly reads: "Certified Physician Practice Management"; and

G)     clarifying the language and allegations in ¶ 164 of the initial Complaint, so that the Complaint now, READS, STATES and ALLEGES as follows:

## I.     <u>SUMMARY OF ACTION</u>

1.     *Qui tam* relator Stephanie M. Kruse ( "Relator") brings this action in the name of and on behalf of the United States of America ( "United States" or the "Government"), Qui Tam States and Doe States, and herself and complains against Defendants Computer Programs and Systems, Inc. ("CPSI"), TruBridge LLC ("TruBridge"), Saint Francis Hospital Muskogee formerly Muskogee Regional Medical Center ("Muskogee Regional") , Crescent Medical Center Lancaster ("Crescent Medical") and Artesia General Hospital ("Artesia General"), and for treble damages, penalties, attorney fees and costs, pursuant to the *qui tam* provisions of the False Claims Act, *as amended, 31 U.S.C. §§3729-3733* ("FCA")  for false claims that were submitted or caused to be submitted to the Government  by Defendants.

5

2.     Relator also brings this action personally on her retaliation claim pursuant to the whistleblower provisions of the False Claims Act, as amended, 31 U.S.C. §3730(h) as a result of her wrongful termination and discharge by Defendant TruBridge on September 18, 2017.

3.     This Complaint alleges that the Defendants engaged in a nationwide practice of intentionally submitting fraudulent and false claims to and for payment from federally-funded Medicare, TRICARE and other federally-funded health care programs (hereinafter collectively referred to as the "Federal HealthCare Programs") and state-operated Medicaid programs of the Qui Tam States for inpatient and outpatient hospital and physician services and receiving millions of dollars in payment from the submission of fraudulent and false claims.

4.     Defendants' false and fraudulent practices included the following: (1) submitting false information to circumvent automated claims "edits" designed by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services to prevent improper billing to Federal HealthCare Programs i.e. fraudulent manipulation of claims using CPT codes and/or fraudulent use of modifiers; (2) fraudulent use of permanent staff physicians National Provider Identifier ("NPI") 10-digit identification number for billing services of physicians whose services were not provided by the identified physician and was replaced by a credentialed physician to obtain payment of claims that were or would be rejected by Federal HealthCare Programs; (3) fraudulent use of permanent staff physicians National Provider Identity ("NPI") 10 digit identification number for billing services of locum tenens physicians who services were not billed within the legal time period; (4) fraudulent use of "same day" modifiers for billing duplicate charges that may or may not be of "medical necessity"; (5) fraudulently changing the physical address and/or place of service of the healthcare provider to obtain payment of claims that were or would be rejected by Federal HealthCare Programs; and (6) separately billing medical procedures and tests that Federal HealthCare Programs required to be "bundled".

5.      Defendants CPSI, TruBridge, Muskogee Regional, Crescent Medical and Artesia General committed these acts notwithstanding Relator's protestations that   Defendants' actions would result and resulted in the submission of false or fraudulent claims to Federal HealthCare Programs and primarily Medicare and State Medicaid programs and payment on false and fraudulent claims.

6.      This case is brought under the federal False Claims Act *qui tam* provisions, 31 U.S.C. § 3729 *et seq.*, to recover treble damages and civil penalties on behalf of the United States arising from false or fraudulent claims for reimbursement for medical treatment that were submitted or caused to be submitted by Defendants to Federal HealthCare Programs and primarily Medicare and State Medicaid programs in violation of the FCA.  The  FCA proscribes Defendants' conduct involving fraudulent billing and, thus, the submission of false or non-reimbursable claims to Federal HealthCare Programs, primarily Medicare and State Medicaid programs.

7.      Relator has direct, independent and personal knowledge of Defendants' illegal billing practices and became aware of Defendants' FCA violations and other illegal practices while working for CPSI and then TruBridge in their respective Billing Departments as a Medical Biller, a Medicare Biller, and in positions as Billing Supervisor/Facility Coordinator from August 2011 until her discharge in September 2017.

8.      When assigned to Artesia General in February, 2017  and as a result of her continued education and study in professional medical billing, medical coding and practice management and compliance, Relator came to realize, appreciate and have grave concern regarding earlier illegal and fraudulent billing practices of CPSI and TruBridge when Relator worked in previous employment assignments as a Medicare Biller with Defendant Muskogee Regional from February, 2012 to June, 2012 and as Medicare Biller and then Billing

Supervisor/Facility Coordinator with Crescent Medical Center of Lancaster, Texas from July 2013 to January, 2015.

9.     Defendants' FCA violations and their various fraudulent billing schemes unlawfully increased costs to the Government for medical services. Defendants knew, should have known, or recklessly disregarded that their unlawful activities constituted filing false and fraudulent claims for payment and/or reimbursement from the Government in violations of the FCA and of Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395d, 1395f, 1395k, 1395cc, 1395ww, and Medicare regulations.

10.     Defendants' schemes were designed to illegally charge the Federal HealthCare Programs, primarily Medicare and State Medicaid programs, for medical treatment that these programs were not obligated to pay or reimburse and overcharged the programs for covered treatment. Because of Defendants' fraudulent conduct, the Government paid millions on claims that it would have rejected, and the Government paid more than it would have; had it been aware of Defendants' illegal actions. Moreover, Defendants' illegal practices resulted in increased reimbursement costs to the Government, while Defendants profited beyond what is/was allowed under the law.

11.     Relator obtained personal knowledge from her employment with Defendants CPSI and then TruBridge, a wholly-owned subsidiary LLC of CPSI formed in January, 2013, from July, 2011 until her termination on September 18, 2017; her insider experience in key billing positions with Defendants CPSI, TruBridge, Muskogee Regional, Crescent Medical and Artesia General as well as other medical sites/clients of CPSI and TruBridge not named in this Complaint; and due to her extensive experience, education and training in medical billing, coding and practice management and compliance.

12.     Dating back to at least February 2012 while assigned to Muskogee Regional, Relator repeatedly elevated her concerns to CPSI and TruBridge management that Defendants TruBridge and CPSI billing practices were fraudulent during her six (6) years of employment with CPSI and TruBridge. Defendants disregarded Relator's warnings, evidencing Defendants' intent to defraud and reckless disregard for the falsity of the claims they were submitting to Federal HealthCare Programs, primarily Medicare and State Medicaid programs

## II.     PARTIES

### A.     Relator Stephanie M. Kruse

13.     Relator is a citizen of the United States and at all relevant times was  a resident of Mobile County in the State of Alabama and was employed with and by CPSI and then TruBridge upon its formation in January 2013.

14.     Throughout her six (6) year tenure of employment (August 2011 – September 18, 2017), Relator was employed in medical billing with both Defendant CPSI and TruBridge in each entity's Billing Department in numerous positions: first, as a Medical Biller, then as a Medicare Biller, and subsequently as a Facility Coordinator (billing supervisor position), Facility Coordinator/Billing Supervisor and finally, was promoted to Senior Billing Supervisor/Facility Coordinator in September 2016.

15.     Relator passed the certification exam and became a Certified Professional Biller ("CPB") in September 2016.

16.     Before working for CPSI and TruBridge, Relator had worked for several entities involved in medical billing and insurance claims processing which involved Medicare, Medicaid and other federal healthcare programs, all involving medical billing, for a total of approximately eight (8) years.

17.     From 2011 through her termination on September 18, 2017, Relator worked in the Billing Departments of both Defendants CPSI and TruBridge.

**B.     Government Plaintiffs**

18.     The United States, Qui Tam States and Doe States are the government plaintiffs on whose behalf Relator is initiating and advancing the claims in this action other than the retaliation claim which is personal to her alone.

**C.     Computer Programs and Systems, Inc. ("CPSI")**

19.     CPSI is a Delaware corporation with its principal place of business in Mobile, Alabama since 1979. It made its name as a leading provider of electronic health records ("EHR") systems for rural, community and critical access hospitals. At all times material hereto, CPSI provided its over 650 clients located nationwide in 45 states and the District of Columbia not only EHR systems but also business management services to meet the operational requirements of the rural, community and critical access hospitals it served as clients or "sites", including Defendants Muskogee Regional, Crescent Medical and Artesia General.

20.     Included in its business management services and prior to the formation of its wholly-owned subsidiary LLC, TruBridge in 2013, CPSI provided the billing and debt collection services and other revenue management and revenue cycle support for its clients/sites to collect payment for healthcare services provided by these clients/sites.

21.     CPSI provided billing services to medical providers and hospitals, including but not limited to, Defendant Muskogee Regional, until its formation of TruBridge in 2013.

**D.     TruBridge LLC ("TruBridge")**

22.     Defendant TruBridge (also known as TruBridge Alabama, LLC) is a wholly-owned LLC of CPSI formed in January 2013 with its principal place of business in Mobile, Alabama. It

provides hospitals and other medical providers with billing and debt collection services and other revenue management services.

23.     At all times material, Defendant TruBridge provided billing and debt collection services and other revenue collections and management services to health care providers, Defendants Crescent Medical and Artesia General while Relator was employed with CPSI and/or TruBridge.

24.     TruBridge provided billing services to medical providers and hospitals, including but not limited to, Defendants Crescent Medical and Artesia as well as Texas hospitals: Texas General Hospital of Grand Prairie, Texas; Reagan Memorial Hospital of Big Lake, Texas; and Curahealth Boston in Garland, Texas, all located in the Northern District of Texas.

**E.     Saint Francis Hospital Muskogee formerly Muskogee Regional Medical Center ("Muskogee Regional")**

25.     Defendant Muskogee Regional is a hospital providing health care services at its location in Muskogee, Oklahoma and was provided billing and debt collection services and other revenue collections and management services by CPSI and TruBridge from at least February 2012 through June 2012.

26.     In addition to its hospital in Muskogee, Muskogee Regional and its successor entities provide outpatient services to individuals at a variety of facilities in Oklahoma and through its numerous affiliate primary and specialty care physician practices solely owned by Muskogee Regional and/or its parent healthcare system.  Muskogee Regional and its wholly-owned physician practices were and are a hospital as defined by the Social Security Act, as amended by the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010, 42 U.S.C. § 1395ww(d)(1)(B).

27.     As of 2016, about 38 % of the annual gross revenue of $484,319,165, which equals Total Hospital Patient Revenue of $188,569,540, is paid by Medicare for Medicare beneficiaries.

28.     As of 2016, about 24 % of the annual gross revenue $484,319,165, which equals Total Hospital Patient Revenue of $114,817,108, is paid by Oklahoma Medicaid Agency for Medicaid beneficiaries.

29.     From February 2012 through June 2012, Relator was assigned by CPSI to Muskogee Regional as a Medicare Biller to provide Medicare billing and debt collection services and other revenue collections and management services for and with Muskogee Regional before she was assigned to other clients/sites of CPSI and TruBridge.

**F.     Crescent Medical Center of Lancaster ("Crescent Medical")**

30.     Defendant Crescent Medical is an acute care general hospital  providing health care services at its location in Lancaster, Texas and was provided billing and debt collection services and other revenue collections and management services by TruBridge from at least July 2013 through January 2015.

31.     In addition to its hospital services, Crescent Medical provide outpatient services to individuals at a variety of facilities in the Lancaster-Dallas area through its numerous affiliate primary and specialty care physician practices solely owned by Crescent Medical. Crescent Medical and its wholly-owned physician practices were and are a hospital as defined by the Social Security Act, as amended by the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010, 42 U.S.C. § 1395ww(d)(1)(B).

32.     As of 2016, about 11% or $8,908,162 of Crescent Medical's reported Total Hospital Patient Revenue (reported) of $82,706,434.00 is paid by Medicare for Medicare beneficiaries.

33. As of 2016, about 13 % or $10,830,760 of Crescent Medical's Total Hospital Patient Revenue (reported) of $82,706,434.00 is paid by Texas Medicaid Agency for Texas Medicaid beneficiaries.

34. From July 2013 through January 2015, Relator was assigned by TruBridge as Facility Coordinator and Billing Supervisor with Crescent Medical before she was assigned to other clients/sites of TruBridge.

**G.   Artesia General Hospital ("Artesia General")**

35. Defendant Artesia General is an acute care general hospital providing health care services at its location in Artesia, New Mexico and was provided billing and debt collection services and other revenue collections and management services by TruBridge from at least February 2017 through May 2017.

36. In addition to its hospital services, Artesia General provide outpatient services to individuals at a variety of facilities in the State of New Mexico through its sixteen (16) affiliated primary and specialty care clinics and its physician practices solely owned by Artesia General. Artesia General and its wholly-owned clinics and physician practices were and are a hospital as defined by the Social Security Act, as amended by the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010, 42 U.S.C. § 1395ww(d)(1)(B).

37. About 22% or $37,598,625 of Artesia General's reported Total Hospital Patient Revenue (reported) of $174,022,653.00 is paid by Medicare for Medicare beneficiaries.

38. About 21% or $36,253,369 of Artesia General's Total Hospital Patient Revenue (reported) of $174,022,653.00 is paid by New Mexico Medicaid Agency for New Mexico Medicaid beneficiaries.

39.     From February 2017 through May 2017, Relator was assigned by TruBridge as a Senior Facility Coordinator and Billing with Artesia General and was Senior Billing Supervisor at the time of her termination.

### III.     JURISDICTION AND VENUE

40.     The acts proscribed by *31 U.S.C. S 3729 et seq.* and complained of herein occurred in the Northern District of Texas and Defendants among others, do business in the Northern District of Texas.   Therefore, this Court has subject matter jurisdiction over this case and all Defendants pursuant to 31 U.S.C. 3732(a), as well as under 28 U.S.C. § 1345.

41.     This Court has personal jurisdiction over all Defendants because Defendant Crescent Medical is located within the Northern District of Texas and acts as the provider of healthcare services and products to Federal HealthCare Programs, primarily Medicare and State Medicaid programs. beneficiaries within the Northern District of Texas.   Defendants TruBridge and CPSI provides hospitals and other medical providers including Defendant Crescent Medical as well as other unnamed hospitals and medical providers located in the Northern District of Texas with billing and debt collection services and other revenue management services and nationwide, including the Northern District of Texas, submits claims and receipts payment from Federal HealthCare Programs and accordingly is subject to the jurisdiction of this Court.   All Defendants regularly perform services and submits claims for payment to Federal HealthCare Programs and accordingly are subject to the jurisdiction of this Court.

42.     Venue is proper within the Northern District of Texas pursuant to 28 U.S.C. §§ 1391 (a) (1) and (2), because Defendant Crescent Medical as well as other medical facility clients of Defendants CPSI and TruBridge not named in this Complaint  which are located within the Northern District of Texas, as Defendants CPSI, TruBridge and Crescent Medical have performed

numerous acts proscribed by 42 U.S.C. § 1395nn, 42 U.S.C. § 1320a-7b (b) and 31 U.S.C. §3729, et seq, within the Norther District of Texas.

43.     As of the date of this Complaint, Defendant TruBridge and Defendant CPSI, had 696 active customers/sites nationwide. Of these active sites, 50 medical providers, primarily community and/or rural hospitals, are located and operate in the State of Texas, making the State of Texas (along with the State of Minnesota, which also has 50 active sites), the state where Defendant TruBridge does business with the most number of customers/sites.

44.     In accordance with 31 U.S.C. § 3730(b)(2), the original Complaint in this action was filed under seal; and will remain under seal for as long as the Court authorizes, or such other date as is required by law, and shall not be served upon Defendants until the Court so orders.

45.     On December 15, 2017 and prior to the filing of this Complaint, Relator through her counsel provided a lengthy memorandum to Mr. J. Scott Hogan, the Civil Division Chief Assistant U.S. Attorney, and Ms. Lindsey E. Boran, Assistant U.S. Attorney, both of the U.S. Attorney's Office of the Northern District of Texas, disclosing the factual basis of Relators' claims including the fraudulent conduct to be alleged against Defendants and the  identity of parties that are the basis and subject of this Complaint.

46.     Further, Relator through her counsel indicated her willingness to meet with the Government attorneys to elaborate on the details provided in her confidential memorandum. However, Relator's offer to meet and discuss were declined.  Accordingly, Relator voluntarily and affirmatively disclosed the information on which the allegations in this Complaint are filed to the Government, including prior to filing her original Complaint. See 31 U.S.C. § 3730(e)(4)(B).

47.     This suit is not based upon prior public disclosure of substantially the same allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation,

in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010).

48.     To the extent, if any, that there has been a public disclosure of the information upon which the allegations of this Complaint are based that is unknown to Relator, she is an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901- 902 (2010).

49.     Relator possesses direct and independent knowledge of the information because of her extensive independent investigation into Defendants' wrongdoing, which was conducted while she was employed with both CPSI and TruBridge and assigned to Muskogee Regional, Crescent Lancaster and Artesia General, and based on the fraudulent billing practices she observed at the eleven (11) or more other medical sites which she was assigned to and worked with over her six (6) years employed with CPSI and then TruBridge. Further, Relator obtained information through her extensive communications and interactions with CPSI and TruBridge management and supervisory managers and co-employees in the Billing Departments of CPSI and TruBridge. Finally, Relator derived further independent knowledge base o n  h e r  continued investigation after she left active duties with TruBridge in May 2017 and while on leave before she was terminated in September 2017.

## IV.     FEDERAL HEALTHCARE PROGRAMS

### The Medicare and Medicaid Programs

50.     Title XVIII of the Social Security Act, *42 U.S.C. §§ 1395, et seq.*, established the Health Insurance for the Aged and Disabled, popularly known as the Medicare program. The

United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer contracts with insurance companies or Medicare contractors on behalf of HHS. Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

51.     CMS enters into contracts and pays for health care services provided to Medicare beneficiaries through insurance companies acting as Medicare ("fiscal intermediaries") contractors with the responsibility to process and pay health care claims under Medicare Part A which covers hospital and post-hospitalization services. 42 U.S.C. §§ 1395c-1395i-2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services 42 U.S.C. §§ 1395k, 1395l, 1395x(s), outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors ("carriers") process and pay claims for these services.

52.     Defendants submitted or caused to be submitted fraudulent claims to the United States through several Medicare Part B contractors in and around the Northern District of Texas.

53.     Medicaid is a federally assisted grant program for the states enabling them to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels of services, and administrative and operational procedures. The state directly pays the providers for Medicaid services, with the state obtaining the federal reimbursement share of the payment from accounts drawn on funds from the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The State of Texas, through the Texas Medicaid and Health Partnership ("Texas Medicaid"), State of Oklahoma, through SoonerCare ("Oklahoma

Medicaid") and the State of New Mexico, through Centennial Care ("New Mexico Medicaid"), all participate in the Medicaid program.

54.     Physicians, hospitals and other medical providers make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. The following are representative samples of the types of certifications health care providers make when entering Medicaid Provider Agreements with the State Medicaid programs. While state Medicaid enrollment agreements are continually revised and updated, the certifications within these agreements, as described below, generally survive in similar form from revision to revision.

55.     In the State of Texas, Medicaid Provider Enrollment Application providers certify that "concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law." Texas Medicaid Provider Enrollment Application, at p. 6.5 (available at the Texas Medicaid website and incorporated herein). Providers further certify that "any falsification, omission, or misrepresentation in connection with…claims filed may result in all paid services declared as an overpayment and subject to recoupment." Id. Providers also certify that they will comply with the requirements of the enrollment agreement, including "federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program." Id. at p. 6.2, 6.5. The Texas Medicaid enrollment agreement requires signatories to notify the State of Texas if they fall out of compliance with any of their obligations. Id.

56.     When a provider signs the New Mexico "Medical Assistance Division Provider Participation Agreement, the provider "AGREES TO ABIDE BY AND BE HELD TO ALL FEDERAL, STATE, AND LOCAL LAWS, RULES AND REGULATIONS, INCLUDING, BUT

NOT LIMITED TO THOSE PERTAINING TO MEDICAID AND THOSE STATED HEREIN." State of New Mexico Human Services Department Medical Assistance Division Provider Participation Agreement, at 6 (available at the New Mexico Medicaid website and incorporated herein). Furthermore, the New Mexico regulations state that "A provider who furnishes services to a Medicaid eligible recipient agrees to comply with all federal and state laws, regulations, and executive orders relevant to the provision of services." N.M. Code R. § 8.302.1.11 (2011).

57.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through Medicare, Tricare and other Federal HealthCare programs and from the United States through Medicaid programs of the Qui Tam States and Doe States with Defendants CPSI, TruBridge, Qui Tam States and Doe States submitting fraudulent claims with Defendants CPSI, TruBridge and Crescent Medical being submitted from within the Northern District of Texas.

**TRICARE**

58.     TRICARE Management Activity, formerly known as CHAMPUS, ("TRICARE") is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

59.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through Medicare and from Medicaid Programs of the Qui Tam States and Doe States with Defendants CPSI, TruBridge, and Crescent Medical submitting fraudulent claims from the Northern District of Texas.

## V.     REGULATORY FRAMEWORK

### A.     The False Claims Act

60.     Originally enacted in 1863, the False Claims Act ("FCA") was substantially amended in 1986.  The 1986 Amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  The Act was amended in 2009 and 2010, further strengthening the law.

61.     The FCA provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim until November 2, 2015 and thereafter, for false or fraudulent claims to the Government for payment or approval, a civil penalty of up to $21,563 for each such claim, plus three times the amount of the damages sustained by the Government.  31 U.S.C. § 3729(a)(1).

62.     Under the FCA, any person having information regarding a false or fraudulent claim may bring an action on behalf of the government and is entitled to share in any recovery.  31 U.S.C. §3730(b)(1), (d).  The complaint must be filed under seal without service on any defendant. 31 U.S.C. §3730(b)(2). The complaint remains under seal while the Government investigates of the allegations in the complaint and determines whether to join the action. 31 U.S.C. §3730(a), (b)(4).

### B.     Medicare Program

63.     The Government, through its Medicare program, is one of the principal payers for medical services rendered by Muskogee Regional, Crescent Medical and Artesia General.

63.     Medicare is a Government program primarily benefiting the elderly that was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is

administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency which sets standards and regulations for participation in the program. Medicare Part A primarily covers medical care for patients admitted to the hospital, while Medicare Part B primarily covers doctor visits and medical care provided on an outpatient basis.

64.     The Medicare program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates. Reimbursements are paid out of the Medicare Trust Fund. The Medicare Trust Fund is supposed to reimburse only for those services that were actually performed, were medically necessary for the health of the patient, and were ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient. The Medicare Trust Fund relies on the implied representations of suppliers of Medicare services, reimbursable in whole or in part under Medicare, that the services billed by the providers are medically necessary for the patient, are performed as billed, and are compensable by Medicare.

65.     Medicare and other Federal HealthCare programs require that the service be physically performed and billed accurately according to CMS policies and procedure codes. CMS requires health care providers to certify that they complied with all laws and regulations governing the provision of health care services. These certifications are an absolute condition precedent to retaining the Medicare funds conditionally advanced by the Government and a prerequisite to continued future participation in the Medicare program. Without such certification, Defendants are required to repay all Medicare payments previously received.

66.     When a healthcare provider submits a claim for services performed for a Medicare and/or Medicaid patient, it is submitting a bill for payment to the Government and certifying he/she/it has earned the payment requested and complied with the billing requirements. If the

individual or entity knew or should have known the submitted claim was false, then the attempt to collect payment constitutes a violation of the FCA.  Examples of improper claims include:

- Billing for services that you did not actually render;

- Billing for services that were not medically necessary;

- Billing for services performed by an improperly supervised or unqualified employee;

- Billing for services performed by an employee excluded from participation in Federal health care programs;

- Billing for services of such low quality that they are virtually worthless; and/or

- Billing separately for services already included or should be included in a "bundled fee"

67.     Under 42 U.S.C. § 1320a-7k(d), providers are required to report any overpayments to Medicare within 60 days of the identification of the overpayment or the date that any corresponding cost report is due, whichever is later.  Any overpayment retained by a provider after the deadline of reporting and returning the overpayment is an "obligation" for purposes of the reverse false claims provision of the FCA. 42 U.S.C. § 1320a-7k(d)(3); 31 U.S.C. § 3729(b)(3).

### 1.     Medicare Inpatient Prospective Payment System

68.     The payment rate under the Inpatient Prospective Payment System is determined by the patient's principal diagnosis upon discharge and any secondary diagnoses, comorbidities, complications, procedures performed during the hospital stay, and discharge status.  Based on these factors, a patient is assigned to a diagnosis-related group ("DRG"). Each discharge is assigned only one DRG, regardless of the number of conditions treated or services furnished during the patient's stay. 42 C.F.R. § 412.60.  The payment for each DRG is based on the expenses associated with the patient's condition and treatment, and the hospital's capital and operating costs.

69.     Medicare pays for acute inpatient care in hospitals through the Inpatient Prospective Payment System ("IPPS"). Hospitals receive a predetermined rate for each discharge or each case,

instead of billing Medicare for individual services that are provided during the patient's hospital stay. 42 C.F.R. § 412.2.

70.     The Inpatient Prospective Payment System rate for an acute inpatient hospital stay includes all outpatient diagnostic services and admission-related non-diagnostic services provided by the admitting hospital or an entity wholly owned or operated by the admitting hospital. For example, the care for a Medicare patient who presents with shortness of breath, visits a physician in a practice owned by the hospital, has a chest x-ray, and then is admitted to the hospital for pneumonia, would be reimbursed by the Inpatient Prospective Payment System under a single DRG. These services cannot be unbundled and submitted separately for payment, whether as outpatient services or otherwise.

71.     DRG payments may change based upon the type of care facility from which a patient is discharged. For example, a hospital is paid the full Inpatient Prospective Payment System rate if a patient is discharged from the hospital to his or her home (which includes return to a skilled nursing facility if that is where the patient resided before the hospital stay), or if the patient dies at the hospital. 42 C.F.R. § 412.4(a)(1), (2). Hospitals are paid a graduated per diem rate for each day of the patient's stay if the patient is transferred to another facility from the hospital, rather than formally discharged from the hospital. A transfer occurs if a patient leaves the hospital and is readmitted to another acute care facility or critical access hospital on the same day or is released to a skilled nursing facility as a new admittance to that facility. 42 C.F.R. § 412.4(f).

72.     Hospitals are required to comply with CMS regulations to receive payment and to provide accurate records and reports to CMS as a condition of payment. 42 C.F.R. § 412.40-412.52. If a hospital fails to comply fully with the conditions, CMS may withhold payment until the hospital provides proof of compliance. If the hospital does not adequately correct the

underlying cause of non-compliance, CMS may terminate the hospital's provider agreement. 42 C.F.R. § 412.40.

      **2.**      **Medicare Physician Payment System**

           **a.**      **Credentialing of Physicians – License Requirement and Excluded Physicians**

73.      The National Provider Identifier ("NPI") is a Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification Standard. The NPI is a unique identification number for covered health care providers. Each covered health care provider must have his/her/its own NPI to bill Medicare, Medicaid and other Federal Healthcare Programs for health care services he/she/it has provided.

74.      Covered health care providers and all health plans and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under HIPAA. The NPI is a 10-position, intelligence-free numeric identifier (10-digit number). This means that the numbers do not carry other information about healthcare providers, such as the state in which they live or their medical specialty. The NPI must be used in lieu of legacy provider identifiers in the HIPAA standards transactions.

75.      In addition to having his/her own NPI, CMS requires that an individual healthcare provider's (physician's) credentials be examined as follows:

      a)      request for clinical privileges;

      b)      evidence of current licensure;

      c)      evidence of training and professional education;

      d)      documented experience; and

      e)      supporting references of competence.

§482.22(a)(2), Hospital IG - Medical Staff

76.     Further, CMS requires that Outpatient services must be ordered by a practitioner who meets the following conditions:

a)      is responsible for the care of the patient;

b)      is licensed in the State where he or she provides care to the patient;

c)      is acting within his or her scope of practice under State law; and

d)      is authorized in accordance with policies adopted by the medical staff, and approved by the governing body, to order the applicable outpatient services.

This applies to the following:

(i)  All practitioners who are appointed to the hospital's medical staff and who have been granted privileges to order the applicable outpatient services.;

(ii)  All practitioners not appointed to the medical staff, but who satisfy the above criteria for authorization by the hospital for ordering the applicable outpatient services for their patients.

§ 482.54 (c), Condition of Participation: Outpatient Services, CMS

77.     Under section 1128(b)(7) of the Social Security Act ("the Act"), the Office of Inspector General ("OIG") of the U.S. Department of Health and Human Services may exclude any individual or entity (collectively, "person") from participation in the Federal HealthCare Programs for engaging in conduct prohibited by sections 1128A or 1128B of the Act.

78.     The Exclusion Statute requires OIG to impose exclusions from participation in all Federal Healthcare programs on health care providers and suppliers who have been convicted of any of the following:

- Medicare fraud, as well as any other offenses related to the delivery of items or services under Medicare;

- Patient abuse or neglect;

- Felony convictions for other health care-related fraud, theft, or other financial misconduct;

- Felony convictions for unlawful manufacture, distribution, prescription, or dispensing of controlled substances

79.     OIG also has discretion to impose permissive exclusions on other grounds, including:

- Misdemeanor convictions related to health care fraud other than Medicare or Medicaid fraud or misdemeanor convictions in connection with the unlawful manufacture, distribution, prescription, or dispensing of controlled substances;

- Suspension, revocation, or surrender of a license to provide health care for reasons bearing on professional competence, professional performance, or financial integrity;

- Provision of unnecessary or substandard services;

- Submission of false or fraudulent claims to a Federal health care program

- Engaging in unlawful kickback arrangements;

- Defaulting on health education loan or scholarship obligations

80.     Importantly, excluded physicians may not bill directly for treating Medicare and Medicaid patients, nor may their services be billed indirectly through an employer or a group practice. 42 U.S.C. §1320a-7

### b.     Payment of Substitute Physicians (Locum Tenens) – 60-day Rule

81.     Sections 30.2.10 and 30.2.11 of the CMS Internet-only Manual in Publication 100-04, Chapter 1, General Billing Requirements, state that a patient's regular physician may bill for services furnished by a substitute physician, either on a reciprocal or locum tenens basis, when the regular physician is unavailable to provide the services. Both the law at section 1842(b)(6)(D)(iii) of the Act and the manual instructions cited above state that the services of the substitute physician are not to be provided over a continuous period of longer than 60 days.

82.     Substitute physicians are generally called "locum tenens" physicians. It is a longstanding and widespread practice for hospitals and physician groups to retain substitute

physicians to take over for regularly employed physicians when the regular physicians are absent for reasons such as illness, pregnancy, vacation, or continuing medical education, and for the regular physician to bill and receive payment for the substitute physician's services as though he/she performed them. The substitute physician generally has no practice of his/her own and moves from area to area as needed. The regular physician, his group or his employer generally pays the substitute physician a fixed amount per diem, with the substitute physician having the status of an independent contractor rather than of an employee. Subsection A, 30.2.11, Transmittal 1486, Pub 100-04, Medicare Claims Processing, CMS Manual System, April 4, 2008.

83.     For payment of physician services under the locum tenens arrangements, a regular physician may submit the claim, and (if assignment is accepted) receive the Part B [Medicare] payment, for covered visit services (including emergency visits and related services) of a locum tenens physician who is not an employee of the regular physician and whose services for patients of the regular physician are not restricted to the regular physician's offices, if:

- The regular physician is unavailable to provide the visit services;

- The Medicare beneficiary has arranged or seeks to receive the visit services from the regular physician;

- The regular physician pays the locum tenens for his/her services on a per diem or similar fee-for-time basis;

- The substitute physician does not provide the visit services to Medicare patients over a continuous period of longer than 60 days subject to the exception noted below; and

- The regular physician identifies the services as substitute physician services meeting the requirements of this section by entering *HCPCS code modifier Q6 (service furnished by a locum tenens physician)* (emphasis added) after the procedure code.

  Subsection B, 30.2.11, Transmittal 1486, Pub 100-04, Medicare Claims Processing, CMS Manual System, April 4, 2008.

84.     For a medical group to submit assigned and unassigned claims for the services a locum tenens physician provides for patients of the regular physician who is a member of the group [or employed by the hospital], the requirements of subsection B [paragraph 83 above] must be met. For purposes of these requirements, per diem or similar fee-for-time compensation which the group pays the locum tenens physician is considered paid by the regular physician. Also, a physician who has left the group and for whom the group has engaged a locum tenens physician as a temporary replacement may bill for the temporary physician for up to 60 days. (emphasis added) The group must enter in item 24d of Form CMS-1500 the HCPCS modifier Q6 after the procedure code. Until further notice, the group must keep on file a record of each service provided by the substitute physician, associated with the substitute physician's UPIN or NPI when required, and make this record available to the carrier upon request., Medicare Claims Processing Manual, CMS Pub. No. 100-4, Subsection C, 30.2.11, Transmittal 1486, April 4, 2008

85.     The use of modifier Q6 by the regular physician (or medical group/hospital, where applicable) certifies that the covered visit services furnished by the substitute physician are identified in the record of the regular physician which is available for inspection and are services that the regular physician (or group) is entitled to submit.

86.     If services are provided by a substitute physician over a continuous period of longer than 60-day period, the regular physician must bill first 60 days with modifier Q6. However, after the 60-day period:

- Substitute physician must bill for remainder of services in his/her own name under his/her own NPI;

- *Regular physician may not bill and receive direct payment for services over the 60-day period* (emphasis added); and

- A new 60-day period of covered visits can begin after regular physician has returned to work

### 3.     **Outpatient Prospective Payment System**

87.     Medicare pays for outpatient care for beneficiaries through its Outpatient Prospective Payment System ("OPPS"). Under the OPPS, Medicare pays predetermined amounts for designated services. 42 C.F.R. § 419.2. The OPPS applies to most outpatient services provided at most hospitals, with exceptions that do not apply to Mercy Hospital or Mercy Medical Associates. 42 C.F.R. §§ 419.20-22.

88.     Medicare classifies outpatient services into ambulatory payment classifications ("APCs" or "APC"). Ambulatory payment classifications group procedures together that are clinically similar and use a similar amount of resources so that comparable procedures receive comparable reimbursement rates. 42 C.F.R. § 419.31; Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 4, §10.2.

89.     APC payments include overhead and supplies, which cannot be billed separately under the Outpatient Prospective Payment System. These items are an integral part of another service that is paid under the Outpatient Prospective Payment System and the cost has been factored in to the reimbursement rate for that service. Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 4, §10.4.

90.     Items and services that must be included as packaged cost items and not billed separately from services include (but are not limited to): use of operating room, procedure or treatment room, recovery room, and observation services; medical supplies including surgical supplies and equipment, certain pharmaceuticals, surgical dressings, substitute skin products and other products that aid wound healing; supplies and equipment related to anesthesia or sedation; certain clinical diagnostic tests; and durable medical equipment that is implantable. 42 C.F.R § 419.2(b).

### a.   Same-Day Rule

91.     When multiple procedures with multiple ambulatory payment classifications are performed on the same day, Medicare regulations require that payment to the hospital be reduced. 42 C.F.R. § 419.44.  When multiple claims for certain outpatient services occur on the same day, Medicare regulations require that these claims be packaged together to avoid overpayment for the fixed costs that are incorporated into the payment for that APC. Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 4, §§ 10.4, 10.4.1. Accordingly, hospitals are required to report all OPPS services that are provided on the same day on the same claim.  Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 4, § 170.

92.     Under certain circumstances, a provider may need to indicate that a procedure or service was separate or distinct from other services performed on the same day which it normally is bundled with.  Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 23 § 20.9.1.1(B). Modifier -59 is appended to a bundled CPT code to identify procedures or services that are for distinct, unrelated medical conditions. Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 4, § 180.4.  For example, hospitals may report the G0 code if a beneficiary goes to the emergency room in the morning for a broken arm, and again to the emergency room in the evening of the same day for chest pain. Id.

93.     Claims that are reported with condition code G0 indicate that the outpatient visit is eligible to be paid separately from an outpatient visit from the same day at the same revenue center, because the medical conditions are unrelated.  The G0 code bypasses Medicare's audit system and certifies that the billed services are unrelated, separate services eligible to be paid separately and not as part of a packaged payment.

### b.        Bundling Requirements and Use of Modifier -59

94.        Medicare requires that certain services, when performed together on the same individual, be bundled into one comprehensive charge rather than separately paid. Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 23, § 20.9.2.  The payment for the bundled code includes payment for the individual services included within the CPT code. Id.

95.        Medicare's claims processing system includes a set of "code pairs" that generally should not be billed together by a provider for a beneficiary on the same date of service. Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 23, § 20.9.  These "code pairs" are designed to prevent payment for a secondary normally bundled but are correctly being billed as separate services under the circumstances.  Id.

96.        Modifier -59 may be appended to a lesser-included procedure or service if the service represented a different patient encounter or session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or a separate injury not ordinarily encountered or performed on the same day by the same physician. Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 23 § 20.9.1.1(B). For instance, Modifier -59 can be used to indicate that two or more procedures were performed at the same visit but to different sites on the relevant patient's body.

97.        Clinical documentation must support the use of the Modifier -59 and this modifier should never be used strictly to prevent a service from being bundled or to deceive the Medicare claims processing system.  Medicare Claims Processing Manual, CMS Pub. No. 100-4, Ch. 12 § 30(M). It is a violation of Medicare's billing rules to utilize Modifier -59 for a lesser-included claim when the service was not separate and unique from the bundled claim.

98.     Improper use of Modifier -59 to bypass Medicare edits without documented support is a significant area of fraud and abuse in the Medicare program. See CMS Transmittal 1422: Specific Modifiers for Distinct Procedural Services, CMS Pub. 100-20, (Aug. 15, 2014); See Department of Health and Human Services, Office of the Inspector General, "Use of Modifier -59 to Bypass Medicare's National Correct Coding Initiatives," (OEI-03-02-00771, November 2005).

### c.     Use of Modifier XU

99.     Effective January 1, 2015, Modifiers XE, XS, XP and XU were implemented by CMS to provide greater reporting in situations where modifier 59 was previously reported and to be used in lieu of modifier 59 whenever possible.  According to CMS, modifier 59 should only be utilized if no other more specific modifier is appropriate

100.    The Modifier XU is to be used with "Unusual Non-Overlapping Services" for diagnostic or therapeutic procedures occurring at the same or near in time but involves a service that is distinct because it does not overlap usual components of the main service. CMS, National Correct Coding Initiative Policy Manual for Medicare Services

### VI.     **RELATIONSHIPS OF THE PARTIES**

101.    Throughout Relator's tenure of employment, Defendants CPSI and then TruBridge entered into contractual arrangements with Defendants Muskogee Regional, Crescent Medical, and Artesia General (sometimes referred to collectively as "Hospitals") to provide the hospitals and their affiliated clinics and physician practices with billing and debt collection services and other revenue management services.

102.    Pursuant to the contracts between CPSI and/or TruBridge and the Hospitals, CPSI and/or TruBridge received as compensation a percentage (3% to 4%) of the Hospitals gross collections. Thus, the more the Hospitals collected, the more money CPSI and TruBridge earned.

103.    In February 2012, Muskogee Regional had contracted with CPSI to perform the billing services for the hospital and its wholly-owned and wholly-operated physician practices.

104.    Defendant CPSI provided billing services to Muskogee Regional until the formation of TruBridge in January 2013, which then began to provide billing and collection services to Muskogee Regional. CPSI and TruBridge owned its own proprietary software that integrated with the Hospitals patient and billing records and together submitted patient billings to Medicare, Tricare, Medicaid and other Federal HealthCare Programs as well as Commercial Payors.

105.    In July 2013, Crescent Medical had contracted with TruBridge to perform the billing services for the hospital and its wholly-owned and wholly-operated physician practices.

106.    Relator was assigned to Crescent Medical from July 2013 through January 2015 and TruBridge provided billing services to Crescent Medical pursuant to the contractual arrangement between the two (2) entities.

107.    In February 2015, Artesia had contracted with TruBridge to perform the billing services for the hospital and its wholly-owned and wholly-operated physician practices.

108.    Relator was assigned to Artesia from February 2017 through May 2017.

109.    The Billing Departments of CPSI and then TruBridge were tasked with the responsibility and duty of providing the billing and collections services for the Hospitals pursuant to the contracts with each respective client/site.

110.    Defendant CPSI and TruBridge through frequent site visits and remote computer access to the Hospitals, integrated its billing operations into the Hospitals patient accounts department's own operations. Defendant CPSI and TruBridge worked in an integrated manner with the Hospitals and their employees to perform billing services for the Hospitals. The

integration of the Hospitals billing and patient accounts with the Billing Departments of CPSI was accomplished by utilizing CPSI's proprietary software called "Big Brother" and then upon the formation of TruBridge, by using primarily proprietary software of Evident, LLC, called "Thrive" as well as other outside software already utilized by the Hospitals. Evident, LLC was also a solely owned LLC formed and owned by CPSI.

111.    Relator was assigned to a Billing Team within CPSI and/or TruBridge Billing Department. Relator's Billing Team designation would correspond with the site/client that Relator would be assigned by TruBridge. Once assigned to a site, Relator would then become an integrated member of the Billing Department of the Hospital(s)s, using remote computer access into the Hospitals billing system from CPSI and/or TruBridge offices and thusly, "reported to work" at those sites to perform her duties.

112.    With exception but a few, TruBridge Billing Department employees "worked at sites" nationwide by logging into the site's computer system via remote access from CPSI or TruBridge offices in south Alabama, offices in close by vicinity to the headquarter offices of CPSI and TruBridge in Mobile, Alabama

113.    A Billing Team was comprised of a Medical Biller, a Medicare Biller, CRS (Claims Resolution Specialist), Receipting, a Billing Supervisor/Facility Coordinator and a Senior Billing Supervisor/Facility Coordinator, all of whom worked under the supervision of the Manager assigned to that Client/Site.

114.    Billing Team employees of CPSI and TruBridge, including Relator were paid on an hourly basis for his/her respective work with the Hospitals with most Billing team employees having little more than a high school education.

115.    Managers of the CPSI and TruBridge Billing Teams, including Stephanie Bassenger ("Bassenger") over Muskogee Regional, primarily Patrick O'Rourke ("O'Rourke") over Crescent Medical1 and Miller Callaway ("Callaway") over Artesia General were college graduates, paid on a salary basis and significantly, received "bonus" compensation based on collection efforts of the Billing Teams for each of the Hospitals, which he/she supervised. Thus, the more the Hospitals collected, the more money Bassenger, O'Rourke, and Callaway and other Billing Team Managers earned.

116.    Upon being assigned to a site by CPSI and TruBridge, Relator and other Billing Team members would be provided an instructional manual developed by CPSI and/or TruBridge for each individual site that provided instructions on billing and obtaining payment and to provide instructions on obtaining payment should a billing issue cause rejection or difficulty in obtaining payment or to work the pre-submission of the claim for payment.

117.    This instruction manual was/is referred to as a "Site Book". Each site/medical facility has its own Site Book. Site Books would often have instructions to the Billing Team members regarding the approval of the blanket use of modifiers for obtaining payment from Medicare, Medicaid, and other Federal Healthcare Programs when the claim was being rejected for payment.

118.    Without coding review, without addressing "medical necessity" and/or without any consideration the medical records regarding treatment of the patient which resulted in the hospital or physician charges, the Site Book would instruct the Billing Department members of CPSI and TruBridge, including Relator, how to collect payment for a medical service billed to Federal

---

[1] At Crescent Medical, Relator worked primarily under O'Rourke and under Managers Penecerio, Leslie Giles and Jay Cotney. O'Rourke now is an Assistant Director with TruBridge, an upper management position.

Healthcare Programs (and Commercial payors) when the claim was initially rejected by CMS (Medicare and other Federal Healthcare Programs) and/or State Medicaid programs or had been rejected in other instances. In short, the Site Book instructed the Billing Department how to fix a claim which would not reimburse.

119.    Additionally, should the Site Book for the Hospitals not provide directives on payment of a rejected claim, TruBridge through its Billing Teams Managers or other Management would conduct weekly Phone Conferences which included Chief Financial Officers of the Hospitals, which resulted in additional directives, agreed upon by both TruBridge and the Hospitals, to the Billing Team, including Relator, that would result in manual manipulation of the rejected claims and result in payment by Medicare and other Federal Healthcare Programs and/or State Medicaid programs upon resubmission.

120.    These weekly Conference Calls between TruBridge and the Hospitals were logged electronically into TruBridge' s computer database in folders identified as "(Site Name) Conference Call Log.xls", with Site/Client having its own individual folder which documented the "approvals" between TruBridge and the Site/Customer of  modifiers and directives agreed to and/or discussed in the Conference Calls and/or email communications, that would be authorized for use to obtain payment of rejected hospital and physician charges. These "approvals" were to be included in the Site Book but may or may not be included but would remain in the Site Conference Call Log folder for Billing Department reference.

121.    Relator has personal knowledge of the use of Site Books and weekly Conference Calls and how Defendants CPSI and TruBridge used these tools to fraudulently bill Federal Healthcare programs and State Medicaid programs nationwide in concert with its Clients including Muskogee Regional, Crescent Medical and Artesia General.

122.    Beginning at least from February 2012, Defendants CPSI and TruBridge in concert with Defendants Muskogee Regional, Crescent Medical and Artesia General engaged in a scheme to unlawfully obtain Medicare payment for high-dollar claims – which Medicare had not paid based upon its internal controls on prohibited charges – by submitting or resubmitting these claims with false information designed to circumvent Medicare's internal controls.

123.    Defendants implemented various fraudulent methods of modifying unpaid Medicare claims to circumvent the edit in Medicare's claims processing system that prevented the claims from being paid.

124.    By altering and/or modifying the claims  without a documented clinical basis which Medicare otherwise would not have paid, or for which Medicare would have paid a lesser amount, Defendants knowingly submitted, and caused to be submitted, false claims to the Medicare program, Medicaid, Tricare and other Federal HealthCare programs and knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). Defendants conspired to commit these fraudulent actions in violation of 31 U.S.C. § 3729(a)(1)(C).

125.    Because of these fraudulent practices, Defendants received overpayments from Medicare. Defendants did not report and return the overpayments to Medicare within the time periods specified in 42 U.S.C. § 1320a-7k(d)(2). Instead, Defendants knowingly made, used, or caused to be made or used false statements or records material to their obligation to pay these funds to the Medicare program, and knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit these improperly received overpayments to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

## VII.   FACTUAL ALLEGATIONS

126.   Relator witnessed and was an unwitting participant in what she learned to be fraudulent billing schemes whereby Defendants CPSI and TruBridge in concert with Defendants Muskogee Regional, Crescent Medical and Artesia General engaged in false and fraudulent medical billing practices as follows:

a.   **CPSI and Muskogee Regional**:

   (2) fraudulent use of National Provider Identifier ("NPI") 10-digit identification numbers of permanent staff physicians and/or permanent staff physicians no longer on staff to bill for services of physicians who provided the services to obtain payment of claims that were or would be rejected by Federal HealthCare Programs including Medicaid;

   (3) fraudulent use NPI numbers of permanent staff (regular) physicians for billing services of locum tenens physicians who services were not billed within the 60-day period; and

   (4) submission of false information to  circumvent automated claims "edits" designed by CMS to prevent improper billing to Federal HealthCare Programs i.e. fraudulent manipulation of claims using CPT codes and/or fraudulent use of modifiers.

b.   **TruBridge and Crescent Medical**

   (1) use of permanent staff (regular) physicians NPI and identity to bill services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs including Medicaid; and

   (2) fraudulent billing of medical services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs by using the identity and NPI of credentialed staff physicians (regular) and who were not involved in providing the medical services.

c.   **TruBridge and Artesia General**

   (1) fraudulent use of the NPI of a permanent staff (regular) physicians or a credentialed physician no longer of staff to bill for services of physicians whose services were not provided by the identified physician that were or would be rejected by Federal HealthCare Programs;

   (2) fraudulent use of permanent staff physicians NPI for billing services of locum tenens physicians who services were not billed within the 60-day period;

38

(3) fraudulent changing of physical address and/or place of service to obtain payment of claims that were or would be rejected by Federal HealthCare Programs;

(4) submission of false information to circumvent automated claims "edits" designed by HHS/CMS to prevent improper billing to Federal HealthCare Programs i.e. fraudulent manipulation of claims using CPT codes and/or fraudulent use of modifiers;

(5) fraudulent use of "same day" modifiers for billing duplicate charges that may or may not be of medical necessity; and

(6) fraudulent "unbundling" of claims billing separately medical procedures and tests to Federal HealthCare Programs which were required to be "bundled" by HHS/CMS.

**A.    CPSI and Muskogee Regional fraudulently submitted false physician information of numerous claims and received payment on falsified from Medicare, Medicaid and other Federal Healthcare programs in Muskogee, Oklahoma.**

127.    From February 2012 through June 2012 while employed with CPSI, Relator was employed in medical billing with both Defendants CPSI Billing Department and was assigned to work as a Medicare Biller with Muskogee Regional. While at Muskogee Regional, Relator was assigned to CPSI Team D under the supervision of CPSI Manager, Bassenger.

128.    When Relator began working at Muskogee Regional in February 2012, CPSI proprietary billing software, "Big Brother", was already integrated into Muskogee Regional's patient accounts billing department and CPSI managers had been incorporated into Muskogee Regional's management structure.

129.    CPSI employed an "infused management" structure whereby it inserted CPSI Managers to oversee and manage Muskogee Regional's day-to-day billing and collections operations through CPSI's Billing Department, which included collaboration and working with Hospital billing personnel. CPSI also implemented the use of several proprietary tools to increase Muskogee Regional's collections, including its proprietary software, "Big Brother".

130.   Big Brother was proprietary software was integrated with a hospital's billing system to track the status and expected reimbursement of unpaid claims, and to prioritize claims for follow-up by hospital billing staff.

131.   In a February 2012 email, Relator became aware that a former physician at Muskogee Regional, Dr. Laurie Hast ("Dr. Hast"), who had not worked at the Hospital for two (2) years, was being billed to Medicare, Medicaid, and all Commercial payors in place of physicians whose submitted services had been rejected for payment.

132.   CPSI Facility Coordinator, Darlene Brannon ("Brannon") brought the falsified billing of the physician services under Dr. Hast 's name to Relator's attention and showed Relator an email sent from the Muskogee Regional Business Office Manager to Muskogee' CFO which was copied to Brannon.

133.   Independently, Brannon went directly to CPSI Manager Bassenger and CPSI Vice President and Chief Financial Officer Gregory Leatherbury ("Leatherbury") and confirmed that thousands of physician services charges at Muskogee Regional were falsely submitted and paid fraudulently using the name and NPI of Dr. Hast.

134.   Despite both CPSI and Muskogee having knowledge of the fraudulent payment of claims submitted using Dr. Hast 's NPI and identity, CPSI and Muskogee Regional continued to bill Dr. Hast on the directives of Muskogee Regional's CFO and CPSI's Leatherbury.

135.   At a minimum, from February 2012 through June, 2012 while Relator was assigned to Muskogee Regional, thousands of physician services claims submitted by Muskogee Regional and CPSI involved physicians who were not credentialed, resulted in rejection/denial and were then re-submitted using the name, NPI and identity of Dr. Hast, who had been gone from Muskogee Hospital for more than two (2) years and billing her/him as a "supervising physician".

136.    CPSI Management, including Leatherbury and Brannon2, instructed Relator and other CPSI Billing Department employees, namely Gina Westmoreland ("Westmoreland") - Medical Billers; Christine Aaron, Bernice Kittler, Margaret Rose, Tabitha Henderson to  use the name, NPI and identity of Dr. Hast to obtain payment from Medicare, Medicaid and Commercial payors on the rejected physician claims and that this procedure of processing payment would be listed on the Approval List in the Site Book for Muskogee Regional and which would "cover our culpability".

137.    While Relator was assigned to Muskogee Regional, Dr. Hast contacted CPSI and spoke to Relator. Dr. Hast expressed to Relator on the phone her concern over her taxes as she was and had not worked at Muskogee Regional for more than two years, and that she could not be a "supervising physician" as she is a radiologist (no supervisory duties) and therefore, could not derive any income for work she did not do and had not done for two (2) years as Dr. Hast had no affiliation with Muskogee Regional for that period of time.

138.    Relator brought the information provided in her phone call with Dr. Hast to her new supervisor, Westmoreland, who had taken the place of Brannon.3 Westmoreland along with Relator again brought Dr. Hast fraudulent billing matter to the attention of Leatherbury. This time, Leatherbury agreed that no further billings would be submitted using Dr. Hast's identity and NPI but no corrective action for previously submitted claims was implemented nor was reporting of the fraudulent payments made to CMS or Commercial payors.

---

2   Brannon voiced her objections to her supervisor, Manager Bassenger, but both were instructed by Leatherbury to continue with the manual manipulation of Dr. Hast's NPI as CPSI had approval from Muskogee Regional.
3   Brannon resigned over this incident involving the fraudulent billing of physician services using Dr. Hast's identity and NPI.

139.    Neither Muskogee Regional or CPSI reported any overpayments to Medicare within 60 days of the identification of the overpayment or the date that any corresponding cost report was due.

**B.  TruBridge and Crescent Medical fraudulently billing Medicare, Medicaid and other Federal Healthcare Programs by:**

1) **use of permanent staff (regular) physicians NPI and identity to bill services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs; and**

2) **fraudulent billing of medical services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs by using the identity and NPI of credentialed staff physicians (regular) and who were not involved in the medical services.**

140.    From July 2013 through January 2015 while employed with TruBridge, Relator was employed in medical billing with TruBridge in the Billing Department and was assigned to work as a Medicare Biller, Facility Coordinator/Billing Supervisor with Crescent Medical of Lancaster, working remotely via computer access into the Crescent Medical computer system from TruBridge's office in Mobile, Alabama.

141.    In 2014, CPSI rebranded the Big Brother software into a new proprietary software called "Thrive", which became the software "owned" by a newly formed LLC called Evident, LLC. ("Evident"). Evident was formed and wholly-owned by CPSI. The Thrive proprietary software became the primary billing and revenue cycle software which TruBridge used and integrated into hospitals' patient and billing accounts.[4]

142.    In addition to Crescent Medical, TruBridge has implemented Thrive at numerous other hospitals and healthcare systems nationwide, including Artesia General

---

[4]In addition to Thrive, CPSI has since acquired other subsidiary corporations and LLCs which have similar billing and revenue cycle management proprietary software for use and implementation by TruBridge. One proprietary software obtained through CPSI's acquisition is "Rycan", developed by Rycan Technologies.  Other similar proprietary software was obtained when CPSI acquired Healthland, Inc., and American Health Tech, Inc.

143.     When Relator began working at Crescent Medical in July 2013, TruBridge's billing and revenue cycle software, Thrive, had already been integrated into the Hospital's patient accounts and TruBridge's Billing department and TruBridge's Managers had been infused into Crescent Medical's management structure.

144.     From its opening, Crescent Medical and TruBridge had contracted with each other for TruBridge to provide revenue management services and billing support with use of TruBridge's Thrive proprietary software for billing hospital and physician services including the billing of Crescent Medical's physician practices outside of the hospital.

145.     As CPSI employed an infused management structure with Muskogee Regional and all CPSI sites, TruBridge also employed a similar "infused management" structure with Crescent Medical and all TruBridge sites; whereby TruBridge oversaw and managed Crescent Medical's day-to-day billing and collections operations through TruBridge's Billing Department and its managers, which included collaboration and working with Hospital billing personnel. In doing so, TruBridge would use the Thrive proprietary tools to increase Crescent Medical's collections of payments made from Medicare, Medicaid and other Federal Healthcare Programs as well as Commercial Payors.

146.     While assigned to Crescent Medical, Relator was supervised by multiple TruBridge Managers but primarily under O'Rourke. She was assigned to several different Billing Teams, with each TruBridge Manager being charged with a Billing Team that had an average of four to six facilities under his/her supervision.

147.     Crescent Medical was a newly opened hospital which opened for business in Lancaster, Texas in 2013 owned and operated primarily by Dr. Kahlid Mahmood, who was the

brother of Dr. Tariq Mahmood. Crescent Medical became approved by CMS for Medicare payments in 2015 and shortly thereafter was also approved for Texas Medicaid payments.

148.    It was common knowledge at Crescent Medical, and known to Relator and TruBridge Management, that Dr. Tariq Mahmood ("Tariq") was being investigated for healthcare fraud for his conduct in operating several hospitals in the State of Texas, including Cozby Germany Hospital in Grand Saline, Renaissance Terrell Hospital in Terrell, Central Texas Hospital in Cameron, Community General Hospital in Dilley, and Lake Whitney Medical Center in Whitney.  Tariq was found guilty of healthcare fraud and identity theft violations due to his criminal conduct in the operation of his hospitals and sentenced to prison in April 2015 in the Federal Court of the Eastern District of Texas.

149.    Relator was directly involved in the process of obtaining Medicare approval for Crescent Medical through her employment with TruBridge.

150.    While working at Crescent Medical, Relator witnessed and questioned many practices, including the billing of sixteen (16) physicians who did not have a state medical licenses in the State of Texas. Of the approximately 40 hired physicians, Relator recalls 16 of them had state license issues and discovered the "red flags" associated with these physicians, some of whom were listed/included on the Medicare/CMS statutory exclusion list for 2013-2015.

151.    Upon information and belief, Relator recollects that these physicians were under investigation in relation to the criminal prosecution of Tariq Mahmood and were previously employed with or at hospitals which were owned and operated by Tariq that resulted in his convictions for healthcare related fraud.

152.    Upon learning of the "red flags" of the approximate 16 physicians that were interfering with the ability of TruBridge and Crescent Medical to bill for their medical services,

Relator immediately notified her immediate TruBridge Manager, Patrick O'Rourke ("O'Rourke"). O'Rourke directed Relator to "bill these claims anyway and get it done, as we [TruBridge] had received authorization and approval from the owner Dr. Khalid Mahmood to do so."

153.    Based on O'Rourke's directive, TruBridge and Crescent Medical billed unlicensed and excluded physicians, including the sixteen (16) Relator questioned, to Medicare, Texas Medicaid TMHP, and Medicaid HMO's as well as Commercial Payers from the time the facility first opened for business once it received Medicare/Medicaid certification. Relator was advised by Crescent Medical's Business Office Manager (Stacey LNU) of her apprehension of billing and collecting payments associated with those physicians as she discussed these licensing and credentialing issues with Relator. Stacey left her position as the Business Office Manager and the facility not long after the opening of the hospital due to Crescent Medical being under government investigation due to assets belonging to Tariq's hospitals being moved into Crescent Medical.

154.    Crescent Medical was a contractual client of TruBridge from the Summer, 2013 until January 2015 when they left TruBridge.

155.    At a minimum, from July 2013 through January 2015 while Relator was assigned to Crescent Medical, thousands of physician services claims submitted by Crescent Medical and TruBridge involved physicians who were not credentialed, resulted in rejection/denial and were then re-submitted using the name (a) use of permanent staff (regular) physicians NPI for billing services of physicians who were not licensed to practice medicine and/or had been excluded from participation in Federal Healthcare Programs; and (b) fraudulent billing of medical services of physicians who were licensed to practice medicine and/or had been excluded from

participation in Federal Healthcare Programs by using the identity and NPI of credentialed staff physicians (regular) but not involved in the medical services.

**C.    TruBridge and Artesia General fraudulently submitted false physician claims and received payment on falsified claims from Medicare, Medicaid and other Federal Healthcare programs in New Mexico through a variety of fraudulent billing schemes.**

156.    From February 2017 through May 2017 Relator was employed in medical billing with TruBridge in the Billing Department, assigned to Billing Team F under the supervision of TruBridge Manager, Callaway. She worked as a Facility Coordinator and Billing Supervisor assigned to Artesia General in Artesia, New Mexico working remotely via computer access into the Artesia computer system from TruBridge's office in Mobile, Alabama.

157.    When Relator began working at Artesia General in February 2017, TruBridge's billing and revenue cycle software, Thrive, had already been integrated into the Hospital's patient accounts and TruBridge's Billing department and TruBridge's Managers had been infused into Artesia's management structure.

158.    Since at least 2015, Artesia General and TruBridge had contracted with each other for TruBridge to provide revenue management services and billing support with use of TruBridge's Thrive proprietary software for billing hospital and physician services including the billing of Artesia General's physician practices outside of the hospital.

159.    As with Muskogee, Crescent Medical and all TruBridge sites, TruBridge employed an "infused management" structure; whereby TruBridge oversaw and managed Artesia's day-to-day billing and collections operations through TruBridge' s Billing Department and its managers, which included collaboration and working with Hospital billing personnel. In doing so, TruBridge would use the Evident LLC Thrive proprietary tools to increase Artesia General's collections of

payments pursuant to Medicare, Medicaid and other Federal Healthcare Programs as well as Commercial Payors.

160.    On February 8, 2017, Relator was re-assigned to Artesia General as its Facility Coordinator/Billing Supervisor by TruBridge her then direct Manager, Mark Peneceiro ("Peneceiro"), who supervised her in her as Facility Coordinator/Billing Supervisor of the Cumberland County Hospital in Burkesville, Kentucky, and Danielle Patrick ("D Patrick"), who was an upper management Assistant Director of Business Services with TruBridge and had previously been a TruBridge manager of Relator. At Artesia, her direct TruBridge Manager became Miller Callaway ("Callaway").

161.    At the time of her assignment with Artesia General, Relator has been employed in Billing with CPSI then TruBridge for nearly six (6) years, was certified as CPB and was active in receiving Continuing Education Units ("CEUs") for her continued CPB certification and further medical billing education to obtain her Certified Physician Practice Management certification through AAPC to become a Medical Office Business Manager. In both regards, Relator was actively engaged in studying The Centers for Medicare and Medicaid Services ("CMS")'s program regarding Medicare payment adjustments and rules for the Merit-Based Incentive Payment System ("MIPS") and CMS's new payment and reimbursement framework under Medicare Access and CHIP Reauthorization Act ("MACRA') and importantly, included CMS rules and regulations in medical coding and appropriate usage of CCI edit modifiers.

162.    Even before her first official day, Relator was included on an email from Callaway on February 7, 2017, authorizing Billing Department employees of Artesia General and TruBridge to use Modifier -25 for payment of physician charges [1500 Claims] on "both ER levels and clinic evaluation and management codes" that had been denied/rejected due to CMS'

"same date of service" prohibitions. Callaway instructed in his email that "Clinic CPT's 99201-99205 and 99211-99215 need a 25 modifier if they are billed on the same date of service with CPT's 10040-69990, 70010-79999 or 90281-99140. (See Exhibit "A" attached).

163.    During her first two (2) months, Relator recognized numerous instances where Miller in agreement with Artesia General through Shannon Clark ("Clark"), Chief Revenue Cycle Officer; Cyndi Buck ("Buck"), Compliance Officer of Health Information Management ("HIM") Department, and Dawn McGuire ("McGuire"), Business Office Manager,  would give blanket authorization for the use of modifiers to the Artesia General and TruBridge Billing Departments without  coding review, without addressing "medical necessity" and without any consideration the medical records regarding the patient treatment.

164.    As early as February 21, 2017, Valerie Cole ("Cole"), an Artesia General HIM Coding Specialist, advised via email to Miller of TruBridge and Clark, Buck and McGuire of Artesia General of the misuse of Modifier -57, a modifier to be used for Evaluation and Management ("E & M") level charges but being used for charges not associated with E&M services, and also the misuse of -91 modifier. (See Exhibit "B", p. 7 attached) In pointing out the misuse of these modifiers (-57 and -91), Cole warned: "I cannot stress the need to have whoever is appending modifiers, know what they are doing. If the departments [Artesia and TruBridge Billing] are taking it upon themselves to put modifiers thinking it will 'allow' certain charges to go through, that's very non-compliant." (See Exhibit "B", p. 7 attached)

165.    As of March 1, 2017, Relator was aware of the Modifier -57 "error" and instructed her Billing Team on the accurate use of modifiers to correctly submit claims for reimbursement/payment. (See Exhibit "B", p. 1)

166.    On March 7, 2017, Callaway instructed Artesia General and TruBridge Billing Departments, including Relator, via email that the approval had been authorized by Artesia General and TruBridge to allow the billing and/or re-billing of duplicate EKGs performed on the same day by the same provider by adding Modifier -76 to EKG's with CPT 93000, 93005 and 93010 which had been flagged with "edit 3491" (See Exhibit "C").

167.    Artesia General and TruBridge approved this use of Modifier -76 for the billing and/or re-billing of duplicate EKGs with CPT 93000, 93005 and 93010 performed on the same day by the same provider without coding review, without addressing "medical necessity" and without any consideration the medical records regarding the patient treatment.

168.    The fraudulent submission of claims pursuant to the March 7, 2017 directives of Artesia General and TruBridge Management which authorized the use of Modifier -76 for payment on "same day-same provider" duplicate EKGs with CPT 93000, 93005 and 93010 resulted in the payment of hundreds of thousands of dollars by Medicare, Medicaid, Tricare and other Federal HealthCare Programs to Artesia General from March 7, 2017 to present, to which Artesia General was not legally entitled to receive.

169.    On March 8, 2017, a similar issue of duplicate same day-same provider for duplicate lab tests (urinalysis) with CPT 81001 arose. The submission of these claims by Artesia General and TruBridge resulted in the claims being "flagged" or rejected for payment pursuant to CMS Rules and Regulations.

170.    Without any coding review, without addressing "medical necessity" and without any consideration the medical records regarding the patient treatment, TruBridge through Callaway and Artesia through Clark, Buck and McGuire approved the use of Modifier XU for the

billing and/or re-billing of "same day-same provider" duplicate lab tests (urinalysis) with CPT 81001

171.   If legally submitted or re-submitted for payment consideration, these "same day-same provider" duplicate lab tests (urinalysis) with CPT 81001 should have been re-submitted to the Coding Department for review. If each test was eligible for payment, the two (2) tests should have been "bundled" for payment; rather than submitted separately for payment.

172.   On March 10, 2017, at 9:23 a.m., Relator was advised and instructed via email from Callaway that "we are approved for' a "combination" for billing each of the two (2) lab tests (urinalysis) with CPT 81001 separately rather than bundled, as follows:

|   |   |   |   |
|---|---|---|---|
| 100064665 | 81001 | XU | G0478 |
| 100063962 | 81001 | XU | 80306 |

(See Exhibit "D").

173.   On March 10, 2017, at 9:41 a.m., Callaway instructed Artesia General and TruBridge Billing Departments, including Relator, via email of a "new approval" that "mainly affects Medicare and the few Commercial/Medicaid payors that are flagged by CCI edits".   The new approval authorized Artesia General and TruBridge Billing Departments the use of XU Modifier to allow the billing and/or re-billing of duplicate "same day-same provide" lab tests (urinalysis) with CPT 81001 which was ". . . being flagged for a CCI edit because it [CPT 81001 claim] is present with CPT G0478 or 80305-80307" (See Exhibit "E").

174.   After receiving the March 10, 2017 emails from Callaway, Relator became concerned of the blanket use of modifiers as directed by Callaway and Artesia. Due to her concerns regarding the CCI edits practice of Callaway and TruBridge, Relator questioned the TruBridge Edits Team by contacting Kwanza Wright, Manager of the Edits Team ("Wright"),

Angel Wiggins, Assistant Manager of the Edit Team ("Wiggins") and Support Representative, Matthew Rosser ("Rosser"). In contacting the Edits Team members, Relator confirmed her understanding that CMS updated the CCI Edits Tables every 90 days which precluded the blanket usage of a modifier on an indefinite basis, when Relator and the Edits Team contacted Sean Kennedy, the Manager of TruBridge CCI edits ("Kennedy").

175.    Regardless of CMS 90-day Edits Table, TruBridge's Edits Team advised Relator that she was to follow the directives of Callaway, her Manager, for Artesia General and that all other TruBridge Billing Department employees were also to follow the directives of their Managers in the blanket use of modifiers without any time restriction, despite CMS Tables to the contrary.

176.    Given her instruction from the Edits Team and Callaway, Relator went into the Artesia General Patient Accounts and added the XU Modifier to all charges associated with CPT 81001, which "mainly affects Medicare and the few Commercial/Medicaid payors", without any coding review, without addressing "medical necessity" and without any considering the medical records regarding the patient treatment and, thusly, "unbundled" the duplicate "same day-same provider" lab tests (urinalysis) and submitted them as two (2) separate claims for which payment was received by Artesia General and on behalf of its affiliated physician groups.

177.    In doing so, Relator along with TruBridge and Artesia fraudulently submitted hundreds of claims associated with CPT 81001 using the XU Modifier alone and thus, "unbundled" duplicate "same day-same provider" lab tests (urinalysis) and submitted them as two (2) separate procedures which resulted in the payment of thousands of dollars by Medicare, Medicaid, Tricare and other Federal HealthCare Programs to Artesia General from March 10, 2017 to present, to which Artesia General was not legally entitled to receive.

178.    After March 10, 2017, the XU Modifier was added to the TruBridge Conference Call Logs folder maintained for Artesia General and identified as "Artesia Conference Call Log.xls" and the Artesia General Site Book Approval List thereby instructing TruBridge and Artesia General Billing Departments of approval of the use of XU Modifier for claims associated with CPT 81001 and the "unbundling" of tests associated with CPT 81001 claims.

179.    On March 10, 2017, Relator reviewed and identified incorrect and incomplete 72-hour processing of Medicare, Commercial, and Medicaid, and requested from TruBridge management for additional assistance from Artesia General COO (Clark) via conference call Relator placed on March 14, 2017. Relator located $2.3 M claims submitted improperly in Medicare claims incorrectly worked by reviewing them under CO/193 rejection code for claims from May 2016 to February 2017, which resulted in implementing new processes with Artesia General and TruBridge Billing Departments staff on March 16, 29017.

180.    Her concerns heightened in May 2017 as her CEU and certification studies of MIPS and MACRA study material intensified and she began a retrospective review of some billing practices that she then became very concerned about her personal liability by unwittingly participating in fraudulent practices in the submission of claims both while assigned to Artesia General but also at Muskogee Region, Crescent Medical and other CPSI and TruBridge sites she had been assigned during her six (6) years of employment.

181.    Specifically, Relator recalled her involvement at the instruction of Callaway in billing of physician services which were not paid because of some issue on credentialing (one of whom was a Dr. Vigil) whose services were subsequently submitted and paid using the NPI and identity of a permanent staff physician named Dr. Jorge Abalos.

182.    On May 11, 2017, Relator discovered that beginning in mid- March, 2017, that Edit 10227 was flagging/rejecting physician claims from Artesia General from payment on 25 physicians, including Dr. Vigil, who were affiliated or one-time affiliated with Artesia General, because the submissions were submitted outside of the 60 day period for locum tenen physicians or due to other credentialing issues, primarily these physicians were "not linked" with Artesia General as their NPI taxonomy, facility address, facility NPI and Tax ID were not paired with Payors, including Medicare, Medicaid and other Federal HealthCare Programs as well as Commercial Payors, all of which resulted in hundreds of thousands of 1500 Claims being rejected for payment.

183.    Because of the flagging of these 25 physicians due to Edit 10227, Callaway directed Relator and the TruBridge Billing Department to bill these charges using the NPI and identity of Dr. Abalos and add the Q6 Modifier in order obtain payment on these claims. (Exhibit "F")

184.    On May 11, 2017, Relator confirmed the Q6 improper billing of Artesia General and TruBridge when she again considered email directives from Callaway dated April 27, 2017 regarding billing 300 claims of Dr. David Tempkin changing of the physical address and using the NPI of the hospital and removing the clinic code 02 from the Claims, which were paid. Dr. Tempkin was not linked to his physician billing group. (Exhibit "G") As an example, Relator obtained a Computer Screen Shot of the Artesia General Patient Account of Patient No. 10044088 as of May 12, 2017 regarding the Form 1500 Claims Submissions of Dr. Tempkin and the change in the clinic code to hospital code to fraudulently obtain payment from Medicare on this falsified claim as done in other instances. (Exhibit "H" 5 )

---

[5]The names and other Protected Health Information (as defined in HIPPA) of all patients, including Medicare, Medicaid and other Federal HealthCare Program beneficiaries mentioned in this Exhibit and any other exhibits hereto are redacted. Unredacted copies will be provided to the United States and the States of Oklahoma, Texas and New Mexico and filed with the Court under seal pursuant to Rule 5.2(f) of the Federal Rules of Civil Procedure.

185.    On May 11, 2017, Callaway for TruBridge agreed to by Artesia General added Dr. Rhoda Jones physician charges which are being flagged by Edit 10227 so that her Form 1500 charges could and were fraudulently submitted for payment using the Q6 Modifier and billed using Dr. Abalos' s credentials, and payment was made. Ultimately, Relator was knowledgeable of 25 physicians whose Form 1500 charges were submitted fraudulently using the Q6 Modifier and billed using Dr. Abalos' s credentials. (See Exhibit "I").

186.    Under her direction, Relator obtained a Physician Reimbursement Analysis Report ("Phys. Reimb. Report") on May 17, 2017, which showed, in part, that all Physician charges of Artesia General from February 1, 2015 through May 17, 2017, including those fraudulently submitted and paid using the Q6 Modifier, resulted in Total Revenue of $32,247,412.74. (See Exhibit "J"6)

187.    The Phys. Reimb. Report also reflected that the 25 physicians whose physician charges were fraudulently submitted and paid using the Q6 Modifier to circumvent Edit 10227 resulted in $8.9M Total Revenue fraudulently derived from 14,530 Patient Accounts, which Relator broke down as follows:

- Report A (208 pages) showed 15 of the Q6 physicians were billed 1500 claims on 12,314 Accounts that generated payment of $7.5M; and

- Report B (43 pages) showed 10 of the Q6 physicians were billed 1500 claims on 2,216 Accounts that generated payment of $1.4M

188.    On May 12, 2017, Relator remained concerned regarding the use of the Q6 Modifier and in particularly, for claim submissions outside of the 60-day period. Given such, Relator contacted a trusted, even more experienced TruBridge CPB who was a Support Representative,

---

6The Phys. Reimb. Report in its entirety is 357 pages. Ex. J is the first and last pages of the Report. Contemporaneous with the filing of this Complaint, Relator has provided to the United States and the States of Oklahoma, Texas and New Mexico a complete copy of the Report.

Lisa Longdon Sea-say ("Longdon Sea-say"). Longdon Sea-say confirmed Relator's understanding – it was "never" authorized or approved by CMS to seek payment for locum tenens physician charges for any billings 60 days after first date of service by the physician.

189.    On May 13, 2017, Relator reported the false claims submissions she was aware of to TruBridge Management Callaway and Director Chris Massey and sought to obtain assistance with compliance and cessation of the submissions.

190.    On May 15, 2017, Relator emailed both CPSI and TruBridge Chief Officers; David Dye, Boyd Douglas, Paul Pacey, Chris Fowler and Leatherbury, requesting a compliance officer to review her findings, which included a timeline of her investigation from February 20, 2017 to date and included information regarding non-compliance, fraudulent claim submissions and FCA liability. (See Exhibit "K")

191.    From March 2017 through May 2017, Relator regularly questioned Callaway regarding claims submitted but not paid; and the use of modifiers to obtain payment, particularly claims involving physician charges, locum tenens and Artesia General physicians who were "not linked". These claims by TruBridge and Artesia General involved millions of dollars in medical charges to Medicare, Medicaid, Tricare and other Federal HealthCare Programs as well as Commercial Payors.

192.    As of May 11, 2017, Artesia General had received payments from Medicare totaling $872,901 with monthly collections of $249,759 for 2017. (See attached Ex. "L")

193.    As of May 11, 2017, Artesia General had received payments from New Mexico Medicaid totaling $654,678 with monthly collections of $197,802 and had a total cash from all payors of $4,839,947 for 2017. (See attached Ex. "L")

194.    Based on the cited conduct herein, Artesia General and TruBridge did submit false claims for payment to Medicare, Tricare, Medicaid and other Federal HealthCare Programs by engaging in the fraudulent conduct as follows:

a) fraudulent use of the NPI of a permanent staff (regular) physicians or a credentialed physician no longer of staff to bill for services of physicians whose services were not provided by the identified physician that were or would be rejected by Federal HealthCare Programs;

b) fraudulent use of permanent staff physicians NPI for billing services of locum tenens physicians who services were not billed within the 60-day period;

c) fraudulent changing of physical address and/or place of service to obtain payment of claims that were or would be rejected by Federal HealthCare Programs;

d) submission of false information to circumvent automated claims "edits" designed by HHS/CMS to prevent improper billing to Federal HealthCare Programs i.e. fraudulent manipulation of claims using CPT codes and/or fraudulent use of modifiers;

e) fraudulent use of "same day" modifiers for billing duplicate charges that may or may not be of medical necessity; and

f) fraudulent "unbundling" of claims billing separately medical procedures and tests to Federal HealthCare Programs which were required to be "bundled" by HHS/CMS.

## VII.   CLAIMS FOR RELIEF

### COUNT I

**False Claims Act – Presentation of False Claims**
**31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009**

195.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

196.    Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to an officer or employee of the Government false and/or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

## COUNT II

**False Claims Act – Making or Using False Record or Statement to Cause Claim to Be Paid**
**31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009**

197.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

198.   Through the acts described above and otherwise, in violation of 31 U.S.C. § 3729(a)(2), and, as amended, 31 U.S.C. § 3729(a)(1)(B), Defendants and their agents and employees knowingly made, used, or caused to be made or used false records or statements to get false claims paid or approved by the government; and knowingly made, used, and/or caused to be made or used false records or statements material to false or fraudulent claims paid or approved by the Government.

## COUNT III

**False Claims Act – Making or Using False Record or Statement to Conceal, Avoid, and/or**
**Decrease Obligation to Repay Money**
**31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009**

199.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

200.   Through the acts described above, in violation of 31 U.S.C. § 3729(a)(7) and as amended, 31 U.S.C. § 3729(a)(1)(G), Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government that Defendants had improperly received and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, e.g. a "reverse false claim." Defendants also failed to disclose material facts that would have resulted in substantial repayments to the Government.

## COUNT IV

**False Claims Act - Conspiracy**
**31 U.S.C. § 3729(a)(3), 31 U.S.C. § 3729(a)(1)(C) as amended in 2009**

201.    The allegations of the preceding paragraph are realleged as if fully set forth below.

202.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies to defraud the Government by submitting or causing to be submitted false or fraudulent claims for payment or approval and making, using, or causing to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(3), and, as amended, 31 U.S.C. § 3729(a)(1)(C).

203.    Defendants also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced Government obligations to it or resulted in repayments from it to Government programs.

204.    Defendants CPSI and TruBridge, their employees worked collaboratively to accomplish medical billing and revenue management services for Muskogee Regional, Crescent Medical and Artesia General through frequent site visits and daily remote access to the Hospitals computer records and databases and the presence of CPSI and TruBridge staff including Relator on-site in the Hospital's patient accounts and billing departments.

205.    Defendants, their agents, and their employees, have taken substantial steps in furtherance of those conspiracies, inter alia, by preparing false records, by submitting claims for reimbursement to the Government for payment or approval, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices.

206.    The Government was unaware of Defendants' conspiracy or the falsity of the records, statements, and claims made by Defendants, their agents, and employees, and, as a result thereof, has paid and continues to pay millions of dollars that it would not otherwise have paid.

207.    Furthermore, because of the false records, statements, claims, and omissions by Defendants and their agents and employees, the Government has not recovered federal funds from Defendants that would have otherwise been recovered.

## COUNT V

## OKLAHOMA MEDICAID FALSE CLAIMS ACT

208.    Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

209.    This is a qui tam action brought by Relator and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. Ann. § 5053.1 et seq.

210.    63 Okla. Sta. Ann. § 5053.1(B) provides liability for any person who-

(a)    knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

(b)    knowingly makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim paid or approved by the state;

(c)    conspires to defraud the State by getting a claim allowed or paid;

(d)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.

211.    Defendants CPSI, TruBridge and Muskogee Regional knowingly violated 63 Okla. Stat. Ann. § 5053.1(B) and knowingly presented false claims to the State of Oklahoma and/or caused false claims to be made, used and presented to the State of Oklahoma from 2012 to the present by violating the CMS Medicare Program Integrity Manual (42 CFR § 200 et seq), and Medicare Benefit Policy Manual (42 CFR § 400 et seq) resulting in fraudulent payment of claims by the State of Oklahoma.

212.    Because of the fraudulent billing of physician and hospital claims, all the claims that CPSI, TruBridge and Muskogee Regional knowingly caused physicians, physicians practices and hospital charges from Muskogee Regional, submitted to Oklahoma Medicaid programs and/or other state health care programs are false and/or fraudulent. Further, CPSI, TruBridge and Muskogee Regional knowingly caused physicians and other practitioners to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Compliance with federal and state laws and regulations was a condition of payment.

213.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

214.    Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Oklahoma's payment decision.

215.    The ultimate submission by the physicians and other practitioners of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Oklahoma's loss, and a consequence of the scheme.

216.    As a result of the Defendants' violations of 63 Okla. Stat. Ann. § 5053.1(B), the State of Oklahoma has been damaged.

217.    There are no bars to recovery under 63 Okla. Stat. Ann. § 5053.5, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okla. Stat. Ann. § 5053.2 on behalf of herself and the State of Oklahoma.

218.   To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Oklahoma. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Oklahoma. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

219.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF OKLAHOMA:

(1)   Three times the amount of actual damages that the State of Oklahoma has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Oklahoma;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To RELATOR:

(1)   The maximum amount allowed pursuant to 63 Okla. Stat. Ann. § 5053.4, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VI

## TEXAS FALSE CLAIMS ACT

220.    Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

221.    This is a qui tam action brought by Relator and the State of Texas to recover double damages and civil penalties under Tex. Hum. Res. Code Ann. § 36.001 et seq.

222.    Tex. Hum. Res. Code Ann. § 36.002 provides liability for any person who-

(a.)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid Program that is not authorized or that is greater than the benefit or payment that is authorized;

(b)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning . . . information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(c)    knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

(d)    knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program; or

(e)    knowingly engages in conduct that constitutes a violation under Tex. Hum. Res. Code Ann. § 32.039 (the Texas Anti-Kickback Statute).

223.    The Defendants knowingly violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly presented false claims to the State of Texas and/or caused false claims to be made,

used and presented to the State of Texas from 2015 to the present by CMS Medicare Program Integrity Manual (42 CFR § 200 et seq), and Medicare Benefit Policy Manual (42 CFR § 400 et seq) resulting in fraudulent payment of claims by the State of Texas.

224.    As a result of the fraudulent billing of physician and hospital claims, all the claims that CPSI, TruBridge and Crescent Medical knowingly caused physicians, physicians practices and hospital charges from Crescent Medical, submitted to Texas Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, CPSI, TruBridge and Crescent Medical knowingly caused physicians and other practitioners to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Compliance with federal and state laws and regulations was a condition of payment.

225.    The State of Texas, by and through the Texas Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

226.    Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Texas's payment decision.

227.    The ultimate submission by the physicians and other practitioners of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Texas's loss, and a consequence of the scheme.

228.    As a result of the Defendants' violations of Tex. Hum. Res. Code Ann. § 36.002, the State of Texas has been damaged.

229.    There are no bars to recovery under Tex. Hum. Res. Code Ann. § 36.113(b), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person

with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code Ann. § 36.101 on behalf of herself and the State of Texas. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.

230.    Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Texas. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Texas. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

231.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF TEXAS:

(1)    Two times the amount of actual damages that the State of Texas has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of note less than $5,000 as described in Tex. Hum. Res. Code Ann. § 36.052(a)(3) for each false claim that the Defendants presented or caused to be presented to the State of Texas;

(3)    Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to Tex. Hum. Res. Code Ann. § 36.110, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VII

### NEW MEXICO MEDICAID FALSE CLAIMS ACT

232.    Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

233.    This is a qui tam action brought by Relator and State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq. and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 et seq.

234.    N.M. Stat. Ann. § 27-14-4 provides liability for any person who-

(1)     presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

(2)     presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

(3)     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

(4)    conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent;

(5)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

235.    N.M. Stat. Ann. § 44-9-3 provides liability for any person who-

(a)    knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

236.    The Defendants knowingly violated N.M. Stat. Ann. § 27-14-4 and § 44-9-3 and knowingly presented or caused to be made, used and presented hundreds of thousands of false claims to the State of New Mexico from 2015 to the present by CMS Medicare Program Integrity Manual (42 CFR § 200 et seq), and Medicare Benefit Policy Manual (42 CFR § 400 et seq) resulting in fraudulent payment of claims by the State of Texas.

237.    As a result of the fraudulent billing of physician and hospital claims, all the claims that TruBridge and Artesia General knowingly caused physicians, physicians practices and hospital charges from Artesia General and its affiliated physician practices, submitted to New Mexico Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, TruBridge and Artesia General knowingly caused physicians and other practitioners to falsely certify, expressly and/or impliedly, and represent full compliance with all

federal and state laws and regulations prohibiting fraudulent acts and false reporting. Compliance with federal and state laws and regulations was a condition of payment.

238.    The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

239.    Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New Mexico's payment decision.

240.    The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of New Mexico's loss, and a consequence of the scheme.

241.    As a result of the Defendants' violations of N.M. Stat. Ann. § 27-14-4 and/or N.M. Stat. Ann. § 44-9-3 the State of New Mexico has been damaged.

242.    There are no bars to recovery under N.M. Stat. Ann. § 27-14-10(C), N.M. Stat. Ann. § 44-9-9, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. § 27-14-7 and N.M. Stat. Ann. § 44-9-3 on behalf of himself and the State of New Mexico. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.

243.    Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of New Mexico. Contemporaneously with filing, Relator has provided all material documents related to

this Complaint to the Attorney General of the State of New Mexico. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

244.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW MEXICO:

(1)     Three times the amount of actual damages that the State of New Mexico has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of New Mexico;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to N.M. Stat. Ann. § 27-14-4, N.M. Stat. Ann. § 44-9-7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VIII

### Unlawful Retaliation Under the False Claims Act 31 U.S.C. § 3730(h)

245.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

246.    During Relator's employment for TruBridge, she was assigned to work with Artesia General with TruBridge controlling and directing her work conditions.

247.    Relator reported, at numerous times, all of the above violations of law recited in this Complaint to her superiors at TruBridge and prior to taking a medical leave of absence on May 15, 2017 due to emotional and physical stress in performing her duties when she knew by mid- May 2017  that she was involved with TruBridge and Artesia General  in the submission of false and fraudulent claims to Medicare, Medicaid and other Federal HealthCare programs and also Commercial payors, which resulted in the payment of millions of dollars.

248.    In a May 15, 2017 email with an attached memorandum documenting her investigation and findings, Relator advised of her FCA claims citing the conduct and the statutory

249.    and factual basis for her claims of fraudulent conduct by TruBridge and Artesia General. (See Exhibit "K")

250.    On May 22, 2017, Relator took leave of absence due to medical and health issues and remained on medical leave until August 11, 2017.

251.    With knowledge of Relator's investigation regarding her FCA claims, TruBridge terminated Relator's employment effective September 18, 2017 via email making her termination effective that same day. (See Attached Exhibit "M")

### PRAYER FOR RELIEF

Relator requests that judgment be entered against the Defendants, ordering that:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

2.      Defendants pay not less than $5,500 ($10,781 for claims after 8.31.16) and not more than $11,000 ($21,563 for claims after 8.31.16) for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the Government has sustained because of the Defendants' actions;

3.      Relator be awarded the maximum "relator's share" allowed by 31 U.S.C. § 3730(d);

4.      Relator be awarded all costs, including litigation costs, expert fees and attorneys' fees under 31 U.S.C. §§ 3730(d) and 3730(h) and the MHRA;

5.      Relator be provided with declaratory, injunctive, or equitable relief, as may be appropriate, to prevent further harm to herself and to prevent the harm to others and the public caused by Defendants' retaliation against whistleblowers;

6.      Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

7.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

8.      Relator be awarded all other damages to which she is entitled, including compensatory and punitive damages; and

9.      The Government and Relator obtain such other relief as the Court deems just and proper.

**In Count VIII of this Amended Complaint**: Relator and Plaintiff demands and prays judgment for all proper compensatory damages, special damages and punitive damages in favor of Relator as a result of Defendant TruBridge's retaliation and retaliatory discharge of Relator in violation of 31 U.S.C. § 3730(h), including but not limited to the following: doubled back pay, interest on the back pay, loss of pension, health and other employment benefits; future pay until age of retirement; compensation for all special damages, including emotional distress, mental suffering and anguish; humiliation; damage to her reputation; and inconvenience; plus attorneys' fees and costs;, and such other and further relief as the Court deems just and proper as a result of Defendant TruBridge's retaliation and wrongful discharge.

## IX.    JURY TRIAL DEMAND

252.    Under Fed. R. Civ. P. 38(b), Relator demands trial by struck jury of each claim including the claim personal to her, and all issues to the extent allowed by law.

DATED this 13 September 2018.

Respectfully submitted,

CHRIST N. COUMANIS (COUMC1593)
coumanis@c-ylaw.com

DAVID YORK (YORKD2887)
david@c-ylaw.com
Attorneys for Relator Stephanie M. Kruse

OF COUNSEL:

COUMANIS & YORK, P.C.
2102 Main Street
Post Office Box 2627
Daphne, Alabama 36526
lawfirm@c-ylaw.com
Phone: 251.990.3083
Fax:    251.928.8665

**Mobile:**
P.O. Box 1646
Mobile, Alabama 36633
Phone:  251.431.7272

### CERTIFICATE OF SERVICE

I do hereby certify that I have on September 13, 2018 filed the foregoing pleading with the Clerk of the Court **UNDER SEAL** and have served the following counsel for the United States of America via certified U.S. Mail as follows:

Chad A. Readler, Esq.
Acting Assistant Attorney General
Michael D. Granston, Esq.
Edward Crooke, Esq.
Diana Cieslak, Esq.

Attorneys
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044

Erin Nealy Cox, Esq.
U.S. Attorney
Kenneth Coffin, Esq
Asst. U.S. Attorney, Civil Division
U.S. Attorney, Northern Dist., Texas
1100 Commerce Street
Third Floor
Dallas, TX  75242

Honorable Mike Hunter
Attorney General of Oklahoma
Kelli S. Price, Esq.
Asst. Attorney General.
313 NE 21st Street
Oklahoma City, OK 73105

Honorable Ken Paxton
Attorney General
Susan J. Arenella, Esq.
Managing Attorney
Attorney General of Texas
Civil Medicaid Fraud Division
P.O. Box 12548, Mail Code 056-1
Austin, TX 78711-2548

Honorable Hector Balderas
Attorney General
Emily Luke, Esq.
Asst. Attorney General
Attorney General of New Mexico
Medicaid Fraud Control Division
201 3rd St NW, Suite 300
Albuquerque, NM  87102

CHRIST N. COUMANIS (COUMC1593)

## ATTACHMENTS
## (PREVIOUSLY INCLUDED WITH INITIAL COMPLAINT)

| Exhibit | Documents |
|---------|-----------|
| A | February 7, 2017 Email from Miller Callaway, TruBridge to Artesia General and TruBridge Billing Departments, including Relator Kruse |
| B | February 21, 2017 - March 1, 2017 Emails from Relator Kruse to/from Miller Callaway/TruBridge and Valerie Cole, Artesia General |
| C | March 7, 2017 Email from Miller Callaway, TruBridge to Artesia General and TruBridge Billing Departments, including Relator Kruse and Matthew Rosser, TruBridge |
| D | March 8-10, 2017 Emails from Miller Callaway, TruBridge to/from Shannon Clark, Cyndi Buck, Relator Kruse and Matthew Rosser |
| E | March 10, 2017 Email from Miller Callaway, TruBridge to Artesia General and TruBridge Billing Departments, including Relator Kruse and Matthew Rosser, TruBridge |
| F | March 21-22, 2017 Email from Miller Callaway, TruBridge to Artesia General and TruBridge Billing Departments, including Relator Kruse and Matthew Rosser, TruBridge and Janice Chapman, Artesia General |
| G | April 24-27, 2017 Emails from Miller Callaway to Jennifer Knapp, Relator Kruse and Nikki Sherota of TruBridge and Dawn McGuire, Shannon Clark of Artesia General |
| H | Artesia General Medicare Patient Billing Records, 6.22.16 – 4.19.17 |
| I | TruBridge Locum Billing Basics Screenshot, Artesia General physicians |
| J | Artesia General Hospital Physician Reimbursement Analysis report from dates 2/1/2015 - 5/30/2017 (pp. 1, 340) – Author TruBridge |
| K | Relator's Email Packet to TruBridge/CPSI dated 05.15.2017 re Compliance Officer Request; Review of Artesia General Billings and Relator's findings, OIG Facsimile Cover sheet, Print Outs of CPSI Code of Business Ethic, CPSI Code of Ethics for CEO and Senior Financial Officers, and CPSI Audit Committee Charter; and Screen shots of CPSI website of Audit Committee Members and Directors |
| L | Screen Shot, Artesia General BOOS-Cash Flow Analysis, as of May 11, 2017 |
| M | September 18, 2017 Email from Kipp Bedford to Relator Kruse re Termination of her employment by TruBridge |

Once the Complaint is UNSEALED, Defendants are to be served via U.S. Certified Mail and/or FedEx delivery as follows:

Computer Programs and Systems, Inc. ("CPSI")
J Boyd Douglas - President and Chief Executive Officer
6600 Wall St
Mobile, AL 36695

TruBridge LLC ("TruBridge")
Chris Fowler, President and Chief Operating Officer
3725 Airport Blvd Ste 208-A
Mobile AL 36608

Saint Francis Hospital Muskogee aka Muskogee Regional Medical Center ("Muskogee Regional")
300 Rockefeller Drive
Muskogee, OK  74401

Crescent Medical Center Lancaster ("Crescent Medical")
2500 West Pleasant Run Road
Lancaster TX 75146

Artesia General Hospital ("Artesia General")
702 N 13th Street
Artesia, NM 88210

# Coumanis & York, P.C.

September 13, 2018   **ATTORNEYS AT LAW**

**Via UPS Delivery**
Mr. Colt Fisher
U.S. District Court, Northern District of Texas
Earl Cabell Federal Building
1100 Commerce Street, Room 1452
Dallas, TX 75242

Re:    **Amended Complaint– 3:CV18-938-K*SEALED*,**
       *United States and States of Oklahoma, Texas and New Mexico ex. rel.,*
       *Stephanie M. Kruse vs. Computer Programs and Systems, Inc.; TruBridge,*
       *LLC; Saint Francis Hospital Muskogee formerly Muskogee Regional Medical*
       *Center; Crescent Medical Center Lancaster and Artesia General Hospital*

Dear Mr. Fisher:

Enclosed you will find our Amended Complaint for filing with Court in the above-styled action, pending **under seal.** As you have done before, please file stamp one of the enclosed copies of the Amended Complaint (with the "Service Copy" cover sheet) and return to me in the enclosed self-addressed, stamped envelope for us to provide Service copies to the Attorney General of the United States, the U.S. Attorney for your District and the Attorney Generals for the States of Oklahoma, Texas and New Mexico.

Thank you for your continued assistance and cooperation. I remain,

Sincerely,

COUMANIS & YORK, P.C.

CHRIST N. COUMANIS
Enclosures: Amended Complaint (2 copies)

This envelope is for use
with the following services:

UPS Next Day Air®
UPS Worldwide Express®
UPS 2nd Day Air®

Do not use this envelope for:

UPS Ground
S Standard
S 3 Day Select®
S Worldwide Expedited®

ly shipping documents on this side.

COUMANIS & YORK P.C
(251) 990-3083
THE UPS STORE #2971
STE 4
2200 HWY 98
DAPHNE  AL 36526-4382

1.9 LBS          LTR I C
SHP WT: 2 LBS
DATE: 13 SEP 2018

SHIP MR. COLT FISHER
TO: U.S. DISTRICT COURT N. D. TX
    EARL CABELL FEDERAL BUILDING
    STE 1452
    1100 COMMERCE ST
    DALLAS  TX 75242-1310

TX 752 9-33

UPS 2ND DAY AIR A.M.    2A
TRACKING #: 1Z 24F 54E 07 7123 0220



BILLING: P/P

ISH 13.00H ZZP 450 03.5U 07/2018

Serving you for more than 100 years
United Parcel Service.

01019511212  4/14  PAC  United Parcel Service

-742-5877)
near you.

tain
must
han

commercial
visit
ocument.

8 oz. or less.
eight.

ctronic media
t send cash

elope

a second time
cipient.

orm, reflecting
s worldwide.
00% recycled
e.